ALL STATES FREIGHT, INC., ET AL. v. NEW
YORK, NEW HAVEN & HARTFORD
RAILROAD CO. ET. AL.

No. 22.  Argued October 21, 1964.—Decided December 14, 1964.

*Homer S. Carpenter* argued the cause for appellants.
With him on the brief was *John S. Fessenden.*

*Edward A. Kaier* and *Eugene E. Hunt* argued the cause
for appellees.  With them on the brief were *Margaret P.
Allen* and *John A. Daily.*

*Robert W. Ginnane* argued the cause for the United
States and the Interstate Commerce Commission, urging
reversal.  With him on the brief were *Solicitor General
Cox, Assistant Attorney General Orrick, Frank Goodman,
Lionel Kestenbaum* and *Fritz R. Kahn.*

MR. JUSTICE STEWART delivered the opinion of the
Court.

This is an appeal from the judgment of a three-judge
district court setting aside an order of the Interstate Com-
merce Commission which had disallowed certain freight
rates filed by the New York, New Haven & Hartford
Railroad Company (hereafter "the New Haven") and
other rail carriers.  The issue presented is whether

§ 1 (6) of the Interstate Commerce Act, as amended, which requires carriers "to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed," [1] is applicable to so-called all-commodity freight rates. The Commission, with three members dissenting, held that § 1 (6) does apply to such rates, and that the section was violated by the rate schedules here in question. 315 I. C. C. 419. The District Court held that § 1 (6) requires "the maintenance in being of class rates" but does not prohibit "competitively compelled departures from classifications, within the established maxima, absent some other violation of the Act than the mere departure from the classification." 221 F. Supp. 370, 374. We agree with the District Court and affirm the judgment before us.

A general word as to the basic distinction between class rates and commodity rates may be appropriate before proceeding to the specifics of the present case. Class

---

[1] "It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful." 49 U. S. C. § 1 (6) (1958 ed.).

rates were at the foundation of the railroad rate structure at the time of the enactment of the Interstate Commerce Act in 1887. Such rates are applied to traffic through two separate tariffs. One tariff, the "classification," assigns each of the many thousand commodities carried by rail to one of presently some 30 categories or classes, based upon the commodity's particular characteristics.[2] A companion tariff specifies the rate at which each class of freight will be carried. By contrast, commodity rates, which were also in existence at the time of the original passage of the Interstate Commerce Act, are rates made specifically applicable for the carriage of a particular commodity or group of commodities from one designated point to another. The original function of commodity rates, which are generally lower than class rates, was to encourage the movement of bulk commodities, such as coal and grain. With the onset and rapid growth of

---

[2] The characteristics of a commodity which are generally considered in determining the classification to which it should be assigned are:

1. Shipping weight per cubic foot.
2. Liability to damage.
3. Liability to damage other commodities with which it is transported.
4. Perishability.
5. Liability to spontaneous combustion or explosion.
6. Susceptibility to theft.
7. Value per pound in comparison with other articles.
8. Ease or difficulty in loading or unloading.
9. Stowability.
10. Excessive weight.
11. Excessive length.
12. Care or attention necessary in loading and transporting.
13. Trade conditions.
14. Value of service.
15. Competition with other commodities transported. *Motor Carrier Rates in New England,* 47 M. C. C. 657, 660–661; *Class Rate Investigation, 1939,* 262 I. C. C. 447, 508; *Investigation and Suspension Docket No. 76,* 25 I. C. C. 442, 472–473.

intermodal competition, the railroads increasingly turned to commodity rates in an effort to prevent diversion of traffic to other modes of transportation. Since 1932, numerous all-commodity or all-freight rail rates have been established between various points throughout the country. Typically, such rates have not literally applied to all commodities, but to a broad number, and they have often applied only to mixed carload shipments. Today only a small fraction of rail carload tonnage moves on class rates; by far the major portion moves on commodity rates of some kind.

In the summer of 1958 the rail carriers competing with the New Haven established a trailer-on-flatcar service. Under this system truck-trailers loaded with various commodities are brought to the railroad's loading ramp for carriage on freight cars to destination for delivery to the consignee at the railroad's unloading ramp. This type of service was instituted in an effort to meet motor carrier competition. *Eastern Central Motor Carriers Assn.* v. *Baltimore & O. R. Co.,* 314 I. C. C. 5. The New Haven had physical clearance problems and equipment shortages which prevented its participation in this type of freight transportation, and during the first two months that the trailer-on-flatcar rates were in effect on competing railroads, the New Haven lost the equivalent of more than 350 cars of traffic from Boston to St. Louis, and suffered substantial further losses of traffic westward from other New England points.

In order to compete with the trailer-on-flatcar rates, and in an effort to cope with a significant imbalance between eastbound and westbound traffic over its lines,[3] the New Haven filed with the Commission the all-com-

---

[3] Every day the New Haven was dispatching approximately 150 empty boxcars to Chicago and St. Louis, with an annual carrying capacity of 3,000,000 tons.

modity rates which have become the subject of the present litigation. These rates applied to traffic between specified New England points and Chicago and St. Louis. Restricted to boxcar freight moving westward, in straight or mixed carloads, the rates were graduated according to minimum weight per car. They did not apply to certain designated kinds of traffic.[4]

The Commission initially suspended the rates, but allowed them to become effective on July 6, 1959, and they have remained in effect since that date. Various motor carrier associations and some of their individual members protested the rates, but in February 1961, Division 2 of the Commission filed a report approving them. 313 I. C. C. 275. On reconsideration later that year, the full Commission held by a divided vote that the rates violated § 1 (6) of the Act. 315 I. C. C. 419.[5] The District Court set aside the Commission's order and enjoined its enforcement, holding that the order rested on an erroneous interpretation of § 1 (6) of the Act. The intervening protestants brought this appeal here, and we noted probable jurisdiction. 376 U. S. 961.[6]

---

[4] The rates did not apply to import, export, or ex-water traffic. In addition, certain commodities were excluded, such as livestock, explosives, scientific equipment, and easily damaged goods.

[5] The Commission's report also spoke of the rates as "constituting a destructive competitive practice in contravention of the national transportation policy," but in a brief filed here the Commission has pointed out that this statement was "merely an adjunct to the Commission's ruling that the rates violated Section 1 (6)," and that this conclusion "cannot be sustained as an independent basis for disallowing the rates, in the absence of additional findings."

[6] The Commission and the United States did not appeal. Instead, the Commission reopened the case for further hearings, since it entertained doubt as to the adequacy of its findings. Those further hearings have been postponed pending resolution of this appeal. The Commission has filed a brief on the merits, however, agreeing, as do all the parties, that the § 1 (6) issue is necessarily presented by this appeal. We agree, and further agree with the Commission that there

It is clear that § 1 (6) gives the Commission power to require that carriers maintain just and reasonable classifications in conjunction with the setting of class rates. The question here posed is whether that section applies to commodity rates as well, and specifically whether it applies to all-commodity rates. No doubt the language of the statute, "just and reasonable classifications of property" and "just and reasonable regulations and practices affecting classifications" is susceptible of a construction which would embrace the rates in issue here. The rates do not apply to a single, uniquely identifiable article but to a large group of commodities, which could be described as a classification of property. But the fact that the terms of the statute can be interpreted broadly enough to encompass these rates without doing violence to the English language does not settle the problem. It remains to inquire whether the legislative history warrants or the statutory structure supports such a broad interpretation.

At the time of the enactment of the Interstate Commerce Act the vast preponderance of rail freight traffic moved on class rates. These classes as well as the rates applicable to them varied greatly among different railroads and different sections of the country. When the Interstate Commerce Act was formulated, consideration was given to empowering the Commission to prescribe classifications, but it was finally concluded that the provisions of the bill which required publication of rates and classifications, together with the provisions regulating unreasonable rates, would ultimately prove adequate to achieve the desired uniformity of classifications.[7] Beginning with its First Annual Report, however, the Commis-

---

is nothing in the District Court's judgment or in our disposition of this appeal to prevent further Commission proceedings with respect to these rates.

[7] S. Rep. No. 46, 49th Cong., 1st Sess., 188.

sion expressed its concern with the continuing lack of uniformity in freight classifications,[8] and seven years later recommended that it be empowered to make a uniform classification.[9]   In 1906 the Hepburn Act gave the Commission power for the first time to prescribe maximum reasonable rates,[10] but transportation charges could still be increased by changes in the classification of any commodity.

The Commission had succeeded in exercising power over classifications in proceedings under §§ 1, 2, and 3 of the Act, and in many cases had declared classifications of particular commodities to be unreasonable.[11]   However, the power of the Commission to halt manipulation of the classification rate system had been thrown into serious doubt by a case decided in 1905.[12]

It was against this background that § 1 (6) was enacted in 1910 as part of the Mann-Elkins Act, which also gave the Commission power to find classifications unreasonable and to prescribe reasonable classifications for the future.[13]   The immediate genesis of these provisions seems to have been a special message to Congress by President Taft recommending ". . . that the commission shall be fully empowered, beyond any question, to pass upon the classifications of commodities for purposes of

---

[8] 1 I. C. C. Ann. Rep. 30–32 (1887).

[9] 8 I. C. C. Ann. Rep. 38–39. See also 5 I. C. C. Ann. Rep. 33.

[10] 34 Stat. 589, 49 U. S. C. § 15 (1) (1958 ed.).

[11] *James Pyle & Sons* v. *East Tennessee, Virginia & Georgia R. Co.,* 1 I. C. C. 465 (1888); *Thurber* v. *New York Central & H. R. Co.,* 3 I. C. C. 473 (1890); see *National Hay Assn.* v. *Lake Shore & M. S. R. Co.,* 9 I. C. C. 264 (1902).

[12] *Interstate Commerce Commission* v. *Lake Shore & M. S. R. Co.,* 134 F. 942, aff'd by an equally divided Court, 202 U. S. 613. In this case the court struck down a Commission order commanding the reclassification of hay and straw to a lower-rated class.

[13] 36 Stat. 546, 551, 552, 49 U. S. C. §§ 1 (6), 15 (1), 15 (7) (1958 ed.).

fixing rates, in like manner as it may now do with respect to the maximum rate applicable to any transportation." [14]

During the course of the debate on the proposed bill in the House of Representatives, Congressman Russell, a member of the Committee on Interstate and Foreign Commerce, said

> "[T]he shipper can be extorted from; he can be made to pay an unjust rate just as well through classification as he can through the fixing of a rate. The carriers can put an article in one classification, subject to a given rate, and if the Interstate Commerce Commission sees fit to declare that rate unreasonable, and reduce it, declaring what shall be a reasonable rate to take its place, the carrying corporation can obtain the same benefit and put the shipper under the same disadvantages by simply changing the classification of the article." [15]

Chairman Mann stated that "classification of freight is just as important as rates, because by moving a particular article from one class to another you affect the rates." [16] He added that "in the course of time undoubtedly the power of the commission to have control of classifications will lead to greater uniformity and possibly to complete uniformity of classifications." [17] The Senate Report alluded only to the doubt which had been recently cast upon the Commission's power to deal with classifications. [18]

---

[14] H. R. Rep. No. 923, 61st Cong., 2d Sess., 3.

[15] 45 Cong. Rec. 5142.

[16] 45 Cong. Rec. 4578.

[17] *Ibid.*

[18] The Senate Report stated:

"Some doubt has been raised as to whether, under the provisions of section 15 of the existing act, the commission is empowered to review *classifications* of freight as well as rates, and to make orders dealing with improper classifications. (Judson on Interstate Commerce, Ed. of 1908, secs. 209, 210.) By section 9 of the bill, this

This legislative history makes it apparent that the object of § 1 (6) was to give the Commission clear power to deal with the twin problems which had arisen in the administration of class rates—the possibility of their manipulation to avoid maximum rate regulation and their lack of uniformity. Those problems never affected commodity rates, because those rates were competitively compelled reductions from whatever class rates would otherwise be applicable, and because standardization of commodity rates would have been completely inconsistent with their basic function of accommodating specific particularized competitive conditions. The legislative history thus fully supports the conclusion that the reach of § 1 (6) of the Act was confined to class rates.

This conclusion is amply confirmed by the pattern of the Commission's decisions since § 1 (6) was enacted. The course of those decisions makes clear that the Commission has given full consideration to the question of whether § 1 (6) applies to all-commodity rates, and has squarely decided that the section is inapplicable. All-commodity rates first came under scrutiny of the Commission more than 25 years ago. In 1937 and 1938, the Commission approved all-commodity rates on four different occasions without the slightest suggestion that the rates were subject to the provisions of § 1 (6). The principal concern of the Commission's inquiry in these cases was to ascertain whether the rates were prejudicial to any person, locality, or description of traffic.[19] In a similar

---

doubt is removed and the power is expressly vested in the commission." S. Rep. No. 355, 61st Cong., 2d Sess., 8 (1910). The authority primarily relied on by the Judson treatise was the *Lake Shore* case, note 12, *supra*.

[19] *Freight from Boston to East Hartford*, 223 I. C. C. 421 (Div. 4, 1937); *Commodities between Chicago, Ill., and Twin Cities*, 226 I. C. C. 356 (Div. 3, 1938); *All Freight between Boston & Maine Railroad Points*, 226 I. C. C. 387 (Div. 4, 1938); *All Freight from Chicago and St. Louis to Birmingham*, 226 I. C. C. 455 (Div. 3, 1938).

case decided in 1939, Commissioner Alldredge filed a dissent expressing the view that § 1 (6) *did* apply to all-commodity rates, and that the rates in question violated that section by lumping into a single category articles which had traditionally been assigned to different categories under the customary classification criteria.[20] With Commissioner Alldredge's dissent putting in issue the applicability of § 1 (6), it is clear that the Commission consciously rejected his position. Two years later, however, the view taken by Commissioner Alldredge prevailed in a two-to-one order by Division 3, which struck down all-commodity rates as violative of § 1 (6).[21] With the decisions thus in conflict, the problem received consideration by the full Commission a year later in *All Freight to Pacific Coast*, 248 I. C. C. 73. There the Commission squarely held that § 1 (6) does not apply to all-commodity rates. Its report stated:

> "Respondents now maintain a full line of class rates governed by the western classification from and to all of the points involved in this proceeding, as required by section 1 (6) of the Interstate Commerce Act. They also maintain hundreds of lower rates as exceptions to the classification, including commodity rates, that are not subject to the classification ratings nor to rules as to mixing of commodities in carloads. . . .

[20] *All Freight between Harlem River, N. Y., and Boston,* 234 I. C. C. 673 (Div. 3, 1939). See also Commissioner Alldredge's dissents in the following cases: *All Freight from Chicago and St. Louis to Santa Rosa, N. Mex.,* 243 I. C. C. 517 (Div. 2, 1941); *All Freight between Los Angeles and Albuquerque,* 28 M. C. C. 161 (Div. 3, 1941).

[21] *All Freight from Eastern Ports to the South,* 245 I. C. C. 207 (Div. 3, 1941). See also the decision under § 216 (b) of the Interstate Commerce Act by Commissioners Alldredge and Johnson in *All Freight from Chicago and St. Louis to El Paso, Tex.,* 28 M. C. C. 727 (Div. 2, 1941).

"Class rates normally reflect the maximum of reasonableness on goods falling within the various classes of traffic. Commodity rates are established, and necessary or desirable exceptions to the classification are made, when circumstances and conditions suggest that the class basis is too high for application on the traffic. We have approved this basis of rate making, and have never required commodity rates to conform to the ratings of the classification." 248 I. C. C., at 86–87.

In a separate concurrence, Commissioner Eastman said:

"As is well known, the classifications of freight which the railroads publish are for the purpose of governing the application of their class rates. The latter are used when no rate has been published applying specifically to the movement in question, such specific rates being called commodity rates. The railroads carry, of course, a vast multitude of separate and distinct commodities, and the class rates are a convenient device for avoiding the publication of a like multitude of separate and distinct rates. . . ." 248 I. C. C., at 88.

Thereafter, the Commission rejected other challenges to all-commodity rates based on § 1 (6) upon the authority of the *Pacific Freight* decision,[22] and the two-to-one decision based on § 1 (6) which Division 3 had previously rendered was recalled and decided upon another ground.[23] In the years that followed, the *Pacific Freight* case was regarded as controlling, and all-commodity rate cases

---

[22] *All Freight from Butte, Mont., to Spokane, Wash.*, 251 I. C. C. 291 (Div. 2, 1942); *All Freight Rates to Points in Southern Territory*, 253 I. C. C. 623 (1942).

[23] *All Freight from Eastern Ports to the South*, 251 I. C. C. 361 (1942).

were decided without reference to the provisions of § 1 (6).[24]  Finally, it is significant that in approving the trailer-on-flatcar service instituted by the New Haven's rail competitors in 1958, the Commission did not discern any problem created by § 1 (6).[25]

Thus both the legislative history and the course of the Commission's decisions clearly impel the conclusion that § 1 (6) does not apply to all-commodity rates.  In reaching this conclusion, we hardly need add that, as the Act is structured, these rates are subject to full policing by the Commission under other provisions.  If a commodity rate is too high, the Commission may reduce it.[26]  If a commodity rate unjustly discriminates against a shipper, the Commission may order the discrimination removed.[27]  If a commodity rate results in an undue preference in favor of or an unreasonable prejudice against any person, locality, or description of traffic, the Commission may require that appropriate adjustments be made.[28]  If a commodity rate is unreasonably low, the Commission may order that it be increased.[29]

---

[24] See *All Freight, Straight Carloads, to and from the South*, 258 I. C. C. 579 (Div. 2, 1944); *All-Commodity Rates between Calif. and Ore., Wash.*, 293 I. C. C. 327 (Div. 3, 1954).

[25] *Eastern Central Motor Carriers Assn.* v. *Baltimore & O. R. Co.*, 314 I. C. C. 5, 48–49. The trailer-on-flatcar rates, unlike the all-commodity rates involved in the present case, are subject to a mixing rule requiring that the lading consist of at least two commodities, no one of which shall exceed 60% of the total volume of the lading. But the New Haven points out that this mixing-rule is satisfied whenever two straight trailerloads, each containing a different commodity, are tendered at the same loading platform under a single bill of lading, even though they may be consigned by different shippers and destined for different consignees.

[26] 49 U. S. C. §§ 1 (5) and 15 (1) (1958 ed.).

[27] 49 U. S. C. §§ 2 and 15 (1) (1958 ed.).

[28] 49 U. S. C. §§ 3 (1) and 15 (1) (1958 ed.).

[29] 49 U. S. C. §§ 1 (5), 15a (2), 15a (3), and 15 (1) (1958 ed.).

The District Court's opinion contains, by way of dicta, considerable discussion concerning the continuing validity of the concept of value of service as a factor in the setting of railroad freight rates, and that subject was also discussed in the briefs and oral arguments in this Court. But the extent to which value of service may continue as a valid element in assessing the lawfulness of rates under the sections of the Act applicable to commodity rates is a question we need not and do not decide. We decide only that the District Court was correct in holding that the issues in this case "should never have been framed under § 1 (6)."

*Affirmed.*

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE BRENNAN join, dissenting.

In my view, the record in this case is inadequate to support the action taken by the Commission and I would vacate the judgment below and remand to the Commission for further proceedings. I dissent, however, from the Court's categorical ruling which in any and all circumstances bars the application of § 1 (6) to any set of rates which bears a commodity rate label.

Section 1 (6) imposes upon carriers the "duty . . . to establish, observe, and enforce just and reasonable classifications of property for transportation." The Court seems to accept the act of excluding commodity rates from this broad imperative as well within the mainstream of Commission functions. I have great difficulty coming to any different answer concerning the Commission's task with respect to §1 (6) now that the Commission has changed its mind, or modified its views, and believes it best serves transportation policy and the goal of just and reasonable rates to subject at least some commodity rates to scrutiny under § 1 (6).

It is no answer to say that Congress intended § 1 (6) to regulate only class rates, for the Commission at this point obviously thinks some commodity rates are in fact class rates, particularly a rate which, as in this case, applies to an enormous range of traffic but at the same time excludes many specific commodities and groups thereof.

Nor will it do to say that if the past decisions of the Commission are to be changed, the job should be left to Congress. This is an erroneous view. If there is a task for Congress, it is the one the Court has itself performed. The dissenting commissioners, with whom the Court essentially agrees, felt constrained to acknowledge that further erosion of the principles of classification might well be in the province of Congress but defended their views as vigorous and wise transportation policy within the realm of proper administrative action. Their difference with the majority of the Commission was over policy, and it is precisely this area which it seems to me the Court invades. Our task on review is a far more limited one. With all due respect, I dissent.