Estado Libre Asociado de Puerto Rico, demandante y apelado, *v.* Aureo Rivera Rivera, Víctor Vélez Rivera, Miguel A. Pantojas et al., demandados y apelantes.

*Número:* O-75-316        *Resuelto:* 20 de enero de 1977

*Pedro J. Varela, Carlos Gorrins Peralta, Armando Cardona, Luis A. Suárez, María Dolores Fernós, Pedro J. Sade y Sonia A. Rodríguez,* abogados de los apelantes y de Servicios Legales de Puerto Rico; *Miriam Naveira de Rodón, Procuradora General,* y *Mario L. Paniagua, Procurador General Auxiliar,* abogados del apelado.

### SENTENCIA

Un grupo de personas, entre ellos los apelantes, comenzaron un piquete el 4 de mayo de 1975 en las inmediaciones de La Fortaleza en San Juan, residencia oficial del Gobernador de Puerto Rico, protestando porque el Gobierno rehusaba legalizar la posesión de terrenos que los protestantes habían ocupado o invadido. El 29 de mayo de 1975 el Tribunal Superior de San Juan, a instancias del Estado, expidió un *injunction* que si bien salvaguardaba el derecho de protesta, prohibió a los miembros del piquete actos que interferían con o anulaban el derecho de privacidad y uso de las vías públicas por vecinos y transeúntes, dispuso que la actividad podría realizarse únicamente durante las horas del día, vedó el uso de amplificadores de sonido, instrumentos y voces ruidosas, la instalación de colchones, colchonetas y demás enseres de cama; y ordenó la eliminación de muebles y vehículos, incluyendo una cantina rodante que estorbaban el paso por las calles y aceras afectadas. Contra el *injunction* apelaron los protestantes y el 30 de mayo de 1975, por estimar razonables las condiciones regulatorias contenidas en la decisión de ins-

tancia, rehusamos suspender el *injunction* pendiente la apelación. (MC-75-33.) Hoy, disuelto hace tiempo el piquete, el alegato de los apelantes no nos mueve a alterar nuestro primer criterio de que la sentencia apelada establece un justo balance entre los derechos de los apelantes y aquéllos de las demás personas afectadas por dicha actividad. *Sucn. de Victoria* v. *Iglesia Pentecostal*, 102 D.P.R. 20 (1974); *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436 (1975).

Con estos antecedentes y fundamentos, la apelación es por la presente, *Desestimada.*

Así lo pronunció y manda el Tribunal y certifica el Secretario. El Juez Asociado Señor Negrón García disintió con opinión en la cual concurre el Juez Presidente Señor Trías Monge.

(Fdo.) Ernesto L. Chiesa

*Secretario*

—O—

Opinión disidente del Juez Asociado Señor Negrón García con la cual concurre el Juez Presidente Señor Trías Monge.

San Juan, Puerto Rico, a 20 de enero de 1977

Orientado por el principio de que nuestra Ley Fundamental posee la suficiente flexibilidad y los mecanismos necesarios para balancear justicieramente los conflictos que se le suscitan a la presente y futuras generaciones, y comprometido en hacer viable en la práctica el exordio constitucional de que Puerto Rico es una sociedad erigida ". . . sobre una base plenamente democrática, [para] promover el bienestar general y asegurar para nosotros y nuestra posteridad el goce cabal de los derechos humanos. . . .", [1] me veo en la obligación

---

[1] Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico.

de disentir del dictamen desestimatorio del Tribunal mediante el cual se confirma la sentencia de *injunction* permanente dictada el 29 de mayo de 1975 por el Tribunal Superior, Sala de San Juan, en torno a unos piquetes diurnos y nocturnos desplegados desde el 4 de mayo de 1975 contra el Gobernador de Puerto Rico en un tramo de la calle Fortaleza frente a la entrada principal de la Mansión Ejecutiva de San Juan.

Escribo esta ponencia consciente de que pueda caracterizarse como académica ya que el piquete finalizó hace tiempo. Dada a la realidad histórica, plasmada en ley, [2] de que La Fortaleza es la Residencia y Oficina Oficial del Gobernador de Puerto Rico, para la cual el único acceso y entrada principal es un segmento limitado de la calle de igual nombre, estoy convencido de que piquetes análogos al de autos, razonablemente surgirán nuevamente en nuestros tiempos, siendo imperativo que el Tribunal profundizara sobre varios extremos de la reglamentación impugnados por los apelantes.

Sostengo que lo acontecido en el caso de autos no es materia muerta para la historia, ya que el ejercicio de la libre expresión es de valor contemporáneo e imperecedero en nuestro país. La desestimación de la Sentencia negando el piquete nocturno limitado, priva al pueblo de su personalidad enérgica debilitando su espíritu en el ejercicio de esta preciosa libertad, que es la única que en una democracia fecundiza y vivifica la libertad política. Su restricción es ponerla fuera del alcance de las clases marginadas, reduciendo a mínimos innecesarios los mecanismos de ley y protesta contra los poderes públicos.

A los fines de fundamentar esta posición, expondré el trasfondo doctrinario constitucional que nutre este derecho.

---

[2] Ley Núm. 1 de 11 de septiembre de 1948, según enmendada. (3 L.P.R.A. sec. 2).

# I

La libertad de expresión garantizada en el Art. II, Sec. 4, de la Constitución del Estado Libre Asociado y la Primera Enmienda de la de Estados Unidos tiene ". . . como fondo la libertad de conciencia . . . y supone el intento de proteger jurídicamente el libre desenvolvimiento de la personalidad a través de los medios más eficaces y habituales de exteriorización de los contenidos de conciencia." (³) El individuo tiene un interés legítimo en poder expresar sus opiniones, y existe también un interés social en fomentar la comunicación y el libre intercambio de ideas. (⁴) De ahí que haya sido descrita como una de las libertades fundamentales del ser humano, gozando de primacía en nuestro orden constitucional. *Aponte Martínez* v. *Lugo*, 100 D.P.R. 282 (1971); *Mari Bras* v. *Casañas*, 96 D.P.R. 15 (1968).

No obstante su importancia, su ejercicio ". . . no supone una irrestricción absoluta de forma que no pueda subordinarse a otros intereses cuando la necesidad y la conveniencia públicas lo requieran." *Mari Bras* v. *Casañas*, supra, pág. 21; *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436 (1975); *P.N.P.* v. *Tribunal Electoral*, 104 D.P.R. 741 (1976). (⁵)

"La libertad de expresión protege el derecho del individuo particular a exteriorizar como guste los contenidos de su conciencia, al mismo tiempo que establece la premisa indispensable para la formación de opinión pública, sobre cuyo régimen está fundado el gobierno democrático. El aspecto político de estas

---

(³) *La Nueva Constitución de P.R.;* Editorial de la U.P.R., pág. 205 (1954).

(⁴) Antieau, *Modern Constitutional Law*, Vol. I, sec. 1:1, pág. 4 (1969).

(⁵) Entre conflictos del derecho al libre ejercicio del culto y la intimidad hemos expresado:

"La protección constitucional ampara la libertad de conciencia más no la libertad de torturar. El Estado no puede intervenir con la devoción y creencia religiosa pero sí con el método de sus practicantes cuando éste hiere y lastima hasta anular el derecho de intimidad (*privacy*) de la familia." *Sucn. de Victoria* v. *Iglesia Pentecostal*, 102 D.P.R. 20, 27 (1974).

garantías, es, pues, tan importante, cuando menos, como el aspecto individual, y ambos necesitan coordinarse. Si sólo hubiera de entrar en consideración el primero, la libertad de expresión podría acaso ser ilimitada en la práctica como lo es en principio; Al entrar en juego el segundo, se impone un sistema que coordine las libertades individuales de los particulares con el fin de mantener las instituciones democráticas en buenas condiciones de funcionamiento." *La Nueva Constitución,* op. cit., pág. 205.

El reconocimiento jurídico del derecho a la libre expresión como parte esencial e integral de la dignidad de la persona humana en nuestra democracia, rebasa su concepción tradicional de comunicación puramente oral y escrita, cobrando nuevas dimensiones a través de demostraciones como la que nos ocupa en el presente caso: el piquete. Como medio de expresión *pacífica,* cuyo fin sea legítimo, es una vía efectiva para la diseminación de ideas y goza de protección constitucional. (⁶) A pesar de que en el pasado el piquete era generalmente asociado con disputas obrero-patronales, ha servido para fomentar muchos objetivos no laborales. (⁷) Representa, además, un mecanismo efectivo de protesta, accesible a muchos grupos que no pueden utilizar, por resultar muy costosos, los medios convencionales de comunicación en masa, a saber, la radio, la prensa y la televisión. (⁸)

El Estado, a su vez, tiene legítimamente el deber de velar por la paz y la tranquilidad de la comunidad, de evitar la violencia, el abuso de la propiedad y de asegurar que las facilidades públicas estén al servicio de todos los ciudadanos. Le corresponde además proteger el derecho a la libre expre-

(⁶) Véase Kaufman, Irving, *The Medium, The Message and the First Amendment,* 45 N.Y.U.L. Rev. 777, 1970; Segrete, Mark, *Freedom of Expression: The Mass Demonstration Under the First Amendment,* 31(3) Ohio St. L.J. 551, 1970.

(⁷) *Picketing the Homes of Public Officials,* 34 U. Chi. L. Rev., 106, 1966–67.

(⁸) Véanse, *Nueva Constitución de Puerto Rico,* supra, págs. 211–212; *Regulations of Demonstrations,* 80 Harv. L. Rev. 1773 (1966–67) y artículos citados en el escolio 6, *supra.*

sión de los que participan en el piquete y el derecho a la privacidad de los otros miembros de la comunidad. (⁹) La libertad irrestricta entraña una incapacidad para perdurar y servir a todos; lleva el germen de la anarquía que es el anti-climax de la libertad misma.

Debido a que se reconoce que el piquete envuelve elementos adicionales de conducta a los de la simple expresión, se ha reconocido repetidamente la facultad del Estado a reglamentarlo en cuanto al número de participantes, el sitio y las horas. Igual poder prevalece respecto a otras actividades análogas tales como la repartición de hojas sueltas, el uso de altoparlantes con referencia a tiempo, hora y lugar. La clave radica en la imposición de restricciones necesarias y razonables con el objetivo de balancear los intereses en conflicto: la libertad de expresión de los manifestantes, el mantenimiento del orden y la tranquilidad en la comunidad y la protección de los derechos de los otros integrantes de la misma. *Graymed* v. *City of Rockford*, 408 U.S. 104 (1972); *Cameron* v. *Johnson*, 390 U.S. 611 (1968); *Cox* v. *Louisiana*, 379 U.S. 558 (1965); *Cox* v. *Louisiana*, 379 U.S. 356 (1965); *Schneider* v. *State*, 308 U.S. 147 (1939); *Haque* v. *CIO*, 307 U.S. 496 (1939).

No existiendo una regla dorada absoluta, la razonabilidad de las restricciones dependerá de las circunstancias particulares de cada caso tomando en cuenta las características del lugar donde se celebra el piquete, la forma de llevarlo a cabo y las personas o funcionarios contra quienes se dirige. Cabe sin embargo destacar, como premisa cardinal, que un piquete es una forma de comunicación y no un medio para la intimidación legal en que predomine una amenaza real de fuerza que equivalga a fuerza ejercida mediante el uso inten-

---

(⁹)*Regulations of Demonstrations*, 80 Harv. L. Rev. *supra;* Antieau, *Modern Constitutional Law, supra*, sec. 1:2, pág. 6; Segrete, Mark, *Freedom of Expressions: The Mass Demonstration Under the First Amendment*, 31(3) Ohio St. L.J., *supra;* Kamin, Alfred, *Residential Picketing and The First Amendment*, 61 NW. U. L. Rev. 177 (1966–67).

cionado desmedido de palabras y actos calculados, con el propósito de causar a una persona ordinaria miedo o daños a su persona, negocio o propiedad. El piquete constitucionalmente salvaguardado es aquel compatible con el principio de que la libre discusión y diálogo de ideas—aun ante grandes diferencias ·de criterios en una sociedad—representa el mecanismo mediante el cual el poder de la razón se impone sobre la pasión como vía pacífica de lograr acceso a la mente humana, resolver los conflictos y ganar adeptos y seguidores. "Las diferencias y los conflictos no perturban la solidaridad de los seres humanos en el bien común sino que, por el contrario la fortalece y afianza." 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico,* pág. 2563 (Ed. 1961). En consecuencia, existe el derecho de un ciudadano o grupo de ciudadanos a protestar y exponer sus criterios de manera pacífica contra la injusticia y la opresión—sea real, ilusoria o imaginaria—y por ende, un piquete no puede ser prohibido o reglamentado irrazonablemente por el simple hecho de que las ideas y opiniones expresadas no gocen del respaldo o la aprobación de la mayoría o no sean de agrado de los miembros de la comunidad, siempre que las mismas caigan dentro de las comunicaciones protegidas constitucionalmente. *Bachellar* v. *Maryland,* 397 U.S. 564 (1970); *Street* v. *N.Y.,* 394 U.S. 576 (1969); *Cox* v. *Louisiana,* supra.

Dentro del marco general de una sociedad democrática existen ciertas limitaciones inherentes a la vida en común que exige tolerancia de todos, tanto de aquellos que desean manifestarse, como de los que por tales mensajes se sienten ofendidos o incómodos. Es ésta la esencia y característica medular de una sociedad libre y domocrática, rasgo que no se encuentra en ningún otro sistema político.

## II

A la luz de estos principios generales, examinemos la reglamentación en el caso de autos. El tribunal determinó

que los apelantes "podrían ejercitar su derecho a la libre expresión y a la protesta mediante la utilización del recurso del piquete", pero que el mismo habría de conducirse "en forma ordenada, prescindiendo del uso de altoparlantes, megáfonos e instrumentos musicales de percusión o de viento con los cuales pudieran producirse sonidos ensordecedores y ofensivos a los sentidos, así como los estribillos y frases de protesta proferidos a coro y de manera ruidosa"; determinó que los apelantes podrían celebrar sus actividades durante el día solamente y "en forma tal que no tengan el efecto de perturbar o menoscabar la salud, la paz, el sosiego, la tranquilidad y la privacidad de las personas que residen o trabajan en el área, ni desplegarán y utilizarán colchones, colchonetas y otros artículos tales como sábanas, cartones, etc. en las dependencias del dominio público o en sitios de propiedad particular sin el permiso de sus dueños"; y determinó que los demandados apelantes "eliminarán del sitio cualquier vehículo de motor o mueble que moleste o interfiera con el libre movimiento de personas y de vehículos por las calles y las aceras incluyendo el camión cantina. . . ."

El piquete, en este caso, se estaba celebrando en el tramo de la Calle Fortaleza comprendido entre la Calle del Cristo y los portones de La Fortaleza. Es esta una calle sin salida, estrecha, en la cual están ubicadas varias oficinas del Gobierno estatal, casas de familia, un hospital y la residencia del Gobernador de Puerto Rico. Son estos factores que necesariamente hay que tomar en cuenta para determinar la razonabilidad de la reglamentación.

Consideremos primero el factor relativo al hecho de que el piquete se estaba llevando a cabo frente a La Fortaleza. Las opiniones sobre los piquetes residenciales de oficiales públicos son muchas y diversas. Por vía de ejemplo, Alfred Kamin expone en su artículo *Residential Picketing and The First Amendment,* 61(2) Nw. U. L. Rev., págs. 177, 228 (1966–67) lo siguiente:

"Pero el caso contra los piquetes residenciales de funcionarios públicos está tan firmemente arraigado que es innecesario fundamentarlo en dicta de la Corte Suprema o en un análisis legal. El propio concepto de gobierno representativo hace odiosa e ilegal tal estratagema de agitación política. Toda demostración en hogares de funcionarios públicos, por necesidad, afectará a los vecinos quienes son extraños a la controversia política. ¿El advenir tal propietario a un puesto público, acaba con su derecho a la privacidad, su familia y vecinos? La interrogante tiene un significado profundo en una sociedad democrática. Si el precio de obtener un puesto público conlleva la pérdida del último reducto de privacidad y reposo, sometiendo a su familia y vecinos al hostigamiento de demostraciones en las aceras, entonces el país habría perdido los servicios de sus ciudadanos más capacitados." (Traducción nuestra.) [10]

En nuestra jurisdicción, [11] debido a que el ". . . derecho a la intimidad tiene firme base en la valorativa puertorri-

---

[10] El autor parece entender que existe una diferencia si la residencia es propiedad del oficial público o si pertenece al estado y el oficial público la vive.

Para un punto de vista distinto, véase *Picketing the Homes of Public Officials*, 34 U. Chi. L. Rev., pág. 106 (1966–67), en el cual el autor destaca una diferencia en enfoque cuando la residencia y la oficina del funcionario están en el mismo lugar, y establece cuatro categorías de funcionarios propietarios en escala ascendente de mayor privacidad en expectativa, a saber: (1) funcionarios públicos; (2) funcionarios cuasi públicos (dueños o propietarios de negocios o líderes de la comunidad que se aíslan del público); (3) funcionarios cuasi públicos y líderes comunitarios accesibles al público; y (4) personas privadas. ·

[11] Las decisiones en las jurisdicciones estaduales norteamericanas reflejan variedad de opiniones. En *Flores* v. *City and County of Denver*, 220 P.2d 373 (1950), el tribunal revocó una sentencia condenando a un grupo de personas que piquetearon en forma pacífica la casa del Gobernador de Colorado. En *Gregory* v. *Chicago*, 394 U.S. 111 (1969), los peticionarios marcharon pacífica y ordenadamente desde la alcaldía hasta la residencia del alcalde y se entendió que la marcha, por ser pacífica y ordenada, estaba protegida por la primera enmienda. En *Scott* v. *D.C.*, 84 A.2d 849 (1962), se tomó conocimiento judicial de que existe un área frente a la Casa Blanca en que se han celebrado muchos piquetes. En *State* v. *Anonymous*, 274 A.2d 897 Conn. (1970), se permitió un piquete frente a la residencia de un jefe de una agencia de estado. En *City of Wauwatosa* v. *King*, 182 N.W.2d 530, Wis. (1971), el tribunal encontró válida una ordenanza que prohibía piquetear la residencia de cualquier persona. Se esta-

queña" hemos sostenido, como regla básica, el derecho a la tranquilidad del hogar de los servidores públicos, haciendo reserva sobre posibles ". . . casos en que por variar alguna de las circunstancias y el peso relativo de los intereses envueltos será necesaria la regulación del piquete y no su prohibición absoluta." *E.L.A.* v. *Hermandad de Empleados*, supra.

En el caso que nos ocupa, fue correcta la determinación judicial no prohibiendo el piquete por el hecho de celebrarse frente a los portones de La Fortaleza. La petición de los manifestantes iba dirigida al Gobernador de Puerto Rico, quien reside y trabaja en dicho lugar y de ordinario, no está accesible al público en ningún otro sitio. De prohibir en forma absoluta la celebración de todo piquete frente a La Fortaleza, estaríamos sin ninguna justificación dejando a los ciudadanos desprovistos de un lugar donde acudir ante el Primer Ejecutivo del país para expresar y exponer sus ideas, opiniones y agravios. En virtud de esta prohibición, dicho funcionario público quedaría prácticamente inmune a este tipo de actividad, la cual, cuando se celebra con un fin legítimo y en forma pacífica y ordenada, está protegida por nuestra Constitución bajo la cláusula que reserva al pueblo el derecho a reunirse en asamblea pacífica y a pedirle al gobierno la reparación de agravios.

Ahora bien, como expresara anteriormente, La Fortaleza, por razones históricas, está ubicada en una calle angosta y sin salida, contigua a varias oficinas del gobierno, residencias particulares y a un hospital. El tribunal de origen determinó que se estaban entorpeciendo las labores de las oficinas y del hospital y que se estaban causando molestias innecesarias a los residentes del área debido a los ruidos producidos por los

---

ban piqueteando los hogares de los miembros de la Junta Escolar. Expresó el tribunal que es constitucional la prohibición de piquetes y paradas en ciertas áreas designadas. Véanse también *García* v. *Gray*, 507 F.2d 539 (1974) y *City of Brookfield* v. *Groppi*, 184 N.W.2d 97, Wis. (1971).

altoparlantes, instrumentos musicales y cantos de los apelantes.

El reconocimiento del derecho a establecer un piquete frente a La Fortaleza, no significa que el mismo pueda conducirse en forma tan alborotada que impida el desempeño de los trabajos y la convivencia a que son acreedores los moradores de las residencias anexas. En armonía con el derecho del Estado a regular las demostraciones que interfieran sustancialmente con el funcionamiento de las oficinas y del hospital, y con el deber de velar por la protección del derecho de privacidad de los residentes del área, fue acertada la reglamentación de la actividad sonora del piquete pues el poder judicial, en justo equilibrio de todos los intereses en conflicto, puede reglar y hasta prohibir las amplificaciones de sonido y que se toquen instrumentos musicales. ([12])

"Igualmente la naturaleza sonora de estas actividades no necesariamente conduce a despojar de protección constitucional a los participantes en las mismas. Ya habíamos indicado que ese tipo de actividades contienen diversos elementos de expresión en forma de discursos, arengas, vítores, aplausos, canciones al igual que expresiones de resentimiento, indignaciones y abucheos que de por sí no justifican necesariamente su disolución. Esto no significa que de tornarse intensamente ruidosas o escandalosas no pueda ser intervenida válidamente por la policía para su dispersión. Tampoco debe deducirse que en determinadas circunstancias la acusticidad producida por los manifestantes no pueda rendirse a la tranquilidad perentoria de las personas o lugares afectados por la manifestación. Por ejemplo, cuando se celebran en las inmediaciones de hospitales, escuelas, cortes de justicia, oficinas, residencias y estructuras análogas y conduzca a un real entorpecimiento de las tareas ordinarias que rebase la normal desatención que alienta la curiosidad por lo que ocurre extramuros, o produzca fundado temor por la seguridad o tranquilidad de los ocupantes en las mismas. Debe, no obstante, comprenderse que esas actividades producen condiciones de insatisfacción, irritación o indignación en algunos oyentes o partici-

---

([12]) Antieau, *supra*, sec. 1:2, pág. 7.

pantes, y que esto también es un valor precisado de las finalidades por esas exhortaciones públicas." (¹³)

En términos generales, merece aprobación esta línea de pensamiento. Un piquete no pierde su característica de pacífico y por ende su protección constitucional por el simple hecho de que los participantes canten o toquen instrumentos musicales. Ahora, esta forma de expresión está sujeta a reglamentación y puede en casos ser prohibida, en atención al lugar en que se lleve a cabo, del disturbio público que cause, y otros factores.

En cuanto al uso de altoparlantes y megáfonos, me remito a los pronunciamientos en el caso de *Mari Brás* v. *Casañas*, supra:

"Previamente precisa establecer que el uso de altoparlantes para la diseminación de ideas y conceptos está protegido por el derecho constitucional que garantiza la libre expresión. En efecto no es más que la emisión de la palabra mecánicamente ampliada. No sólo los adelantos tecnológicos demandan que el derecho protegido no se limite a las usuales y proverbiales formas de expresión sino que las necesidades económicas así lo requieren con vista del control que se ejerce por un grupo limitado sobre otros medios de comunicación en masa y de que es éste un vehículo al alcance de quienes, por su costo, no pueden utilizar en forma efectiva la prensa, la radio y la televisión. Por otro lado, el derecho a la libre expresión conlleva el derecho a ser oído y el uso de medios de ampliación sólo asegura que el mensaje llegará a un número mayor de personas.

.    .    .    .    .    .    .    .

Advertimos finalmente que nada de lo expuesto significa que no pueda reglamentarse el uso de altoparlantes en cuanto a tiempo, lugar y volumen, no sólo para fines electorales sino para cualquier otro fin lícito. Sólo resolvemos que la prohibición absoluta . . . conflige con la Sec. 4 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico. . . ."

_____

(¹³) *Los Derechos de Expresión y el Uso de las Vías Públicas en Puerto Rico*, C.D.C. 1971, págs. 15–16.

Aun cuando coincido en que el tribunal a quo actuó correctamente al reglamentar la actividad sonora del piquete, entiendo que no fue lo suficientemente específico como lo exige la doctrina jurídica que propugna la tesis de que la validez de una reglamentación de conducta bajo tutela constitucional debe ser esbozada de forma tal que sea fácil distinguir la actividad permitida de la prohibida. *Grayned* v. *City of Rockford*, 408 U.S. 104 (1972); *Kejishian* v. *Bd. of Regents*, 385 U.S. 500 (1964); *NAACP* v. *Alabama*, 377 U.S. 288 (1964).

La sentencia se limitó a expresar que los apelantes prescindirían del uso de altoparlantes, instrumentos musicales, etc. "con los cuales pudieran producirse sonidos ensordecedores y ofensivos a los sentidos." Esta disposición a mi juicio es muy vaga, y a pesar de no ser una prohibición absoluta, no especifica cómo se pueden llevar a cabo dichas actividades sonoras. Debió el tribunal reglamentar las mismas en cuanto a volumen, tiempo, número, etc. Pudo limitar a uno el número de altoparlantes o megáfonos y disponer que se usaran con un volumen moderado por breves minutos cada dos horas durante el día; y de igual modo autorizar el uso limitado de dos o tres instrumentos musicales y el canto de estribillos durante la hora de almuerzo (12:00 M. a 1:00 P.M.).

Concurro en que el tribunal de instancia estuvo justificado en ordenar a los apelantes a remover los colchones, *mattresses*, etc. y la cantina rodante. Si bien es cierto que las calles y aceras son de dominio público y han sido los lugares por excelencia para la diseminación de ideas, el Estado demostró el insoslayable interés que posee de velar por la seguridad y salubridad públicas y el libre fluir del tránsito que discurre por una calle tan angosta, evitando el abuso de la propiedad, pública o privada. La garantía de la libre expresión no confiere un derecho a los participantes a "mudarse" al lugar donde se efectúa un piquete, colocando objetos que interfieren y obstaculicen el tránsito, el movimiento de peatones en las aceras y el libre fluir en las entradas y

salidas de los edificios que están ubicados en el área. Y como correctamente determinó el tribunal sentenciador, los apelantes no están autorizados a situar dichos objetos en propiedad privada sin el consentimiento de sus dueños.

Disiento en que una vez reglamentada adecuadamente la actividad sonora del piquete, limitada la misma conforme ha sido expuesta, [14] incluyendo la remoción de todos los objetos que obstaculizan el libre tránsito en la calle y acera, se haya autorizado el piquete únicamente durante el día. En el balance de intereses, soy de opinión que no se interfiere sustancialmente con el derecho de privacidad de los residentes del área el que por la noche, un número limitado de manifestantes continúen el mismo *en silencio* si así lo desean. En tales circunstancias, más que un piquete, el tribunal ha prohibido una vigilia sin causa para ello.

Modificaría la sentencia del Tribunal Superior, a los fines de reglamentar el piquete conforme los siguientes pronunciamientos:

A) Los demandados y aquellas personas que actúan de acuerdo o participan activamente con ellos, podrán ejercitar, si lo desean, su derecho a la libre expresión y protesta, mediante la utilización del recurso del piquete en el tramo de la Calle Fortaleza separada por la Calle Cristo con sujeción a la siguiente reglamentación:

1—*Horas Diarias* (8:00 A.M. a 6:00 P.M)

a) El piquete se conducirá en forma ordenada, participando solamente aquel número máximo de manifestantes que permitan los límites físicos de las aceras públicas sin que se impida el libre fluir y acceso de automóviles y peatones;

---

[14] El insigne Juez William O. Douglas en su obra *The Right of the People* (Freedom of Expression), 35–65 (1958), expuso:

". . . la acumulación de personas juntas usualmente crea problemas que, no obstante ser incidentales a la libertad de expresión y asamblea, deben ser sujetos a algún control en el interés de la paz y silencio o de la ley y el orden." Pág. 58.

b) El piquete se conducirá prescindiéndose del uso de altoparlantes, megáfonos e instrumentos musicales de percusión o de viento, con los cuales puedan producirse sonidos ensordecedores y ofensivos a los sentidos; así como los estribillos y frases de protesta, proferidos individual o colectivamente (a coro) y de manera ruidosa. Queda autorizado el uso de un megáfono a volumen moderado, cuyo sonido no trascienda los límites de diez pies desde el sitio de la persona que lo utiliza, y ello solamente durante el período de tres minutos cada dos horas. El canto individual o colectivo, sin ampliación sonora mecánica y con tres instrumentos musicales de escasa sonoridad, queda autorizado desde las 12:00 M. a 12:15 P.M. y 12:45 P.M. a 1:00 P.M.

c) Estas actividades podrán conducirse solamente *de día* en forma tal, que no tengan el efecto de perturbar o menoscabar la salud, la paz, el sosiego, la tranquilidad y la privacidad de las personas que residen o trabajan en el área. No se desplegarán y utilizarán colchones, colchonetas y otros artículos tales como sábanas, cartones, y otros objetos en las dependencias del dominio público, o en sitio de propiedad particular sin el permiso de sus dueños.

d) En el curso de su manifestación, se eliminarán del sitio cualquier vehículo de motor o mueble que moleste o interfiera con el libre movimiento de personas y de vehículos por las calles y las aceras, incluyendo el camión-cantina estacionado en la Calle Fortaleza.

2—*Horas Nocturnas* (6:00 P.M. a 8:00 A.M.)

Con sujeción estricta a la reglamentación antes expuesta, los demandados y aquellas personas que actúan de acuerdo o participan activamente con ellos, en número no mayor de diez, podrán ejercitar el derecho al piquete, si lo desean, durante las horas nocturnas de 6:00 P.M. a 8:00 A.M., de manera silenciosa. Durante dicho horario, no podrán

hacer uso de ningún megáfono, instrumentos que originen ruido, cantos o expresiones.

B) Los términos de la presente Sentencia deberán ser observados bajo apercibimiento de desacato.

Para una eficaz instrumentación de la misma y conocimiento de todos los interesados, se autoriza a la secretaria del tribunal de instancia la expedición de cuantas copias fueren necesarias de la parte dispositiva para entrega a la Oficina del Alguacil General. Este funcionario, por conducto de las autoridades del orden público, velará por el estricto cumplimiento de lo aquí prescrito. Tomará cualquier medida que estimare pertinente en la delineación y ejecución de este mandato, debiendo velar porque sean protegidos los derechos de todos los concernidos.