417 F.Supp. 851 (1976)
UNITED STATES of America, Plaintiff,
v.
UNITED STATES of America and Interstate Commerce Commission, Defendants,
and
National Classification Committee, Intervenor.
Civ. A. No. 75-213.
United States District Court, District of Columbia.
July 14, 1976.
As Amended September 17, 1976.
*852 David Orligoff, Dept. of Justice, Washington, D. C., for plaintiff.
Kenneth G. Caplan, I. C. C., Washington, D. C., for defendant.
Thomas Auchincloss, Washington, D. C., for intervenor.
Before MacKINNON, Circuit Judge, and SMITH and ROBINSON, District Judges.

OPINION
PER CURIAM.
In this action, the Court is requested to set aside, annul, or suspend a final reclassification order of the Interstate Commerce Commission (ICC), pursuant to 28 U.S.C. §§ 1336(a), 2321-2325 (1970).[1] The order was issued on August 15, 1974 in Investigation and Suspension Docket No. M-24488, Classification Ratings on Passenger Automobiles, Nationwide, culminating almost four years of administrative proceedings. Its effect is to increase by some 60% the cost of shipping an automobile by motor freight. Plaintiff herein is the United States, acting on behalf of the Department of Defense. Defendants are the ICC and an intervenor representing the position of the motor carriers, the National Classification Committee (NCC).[2] The matter is before the Court on Cross Motions for Summary Judgment.

I. The System of Classification and Rates

Classification is the process of assigning numerical ratings to commodities in an attempt to portray their transportation characteristics. The ratings are expressed as percentages of certain established first class rates. Various factors relating to a commodity are considered, such as density, value, susceptibility to damage, difficulty or care involved in handling, stowability, value of service, and trade and competitive conditions.[3] The cost of shipping a particular *853 article may be determined from its weight, its classification rating and the existing tariff or rate. Thus, although they are distinct elements, both classification and rate play a part in establishing the ultimate cost of shipping a commodity.
Since 1936, when the motor carrier industry adopted its classification system wholesale from railroad provisions, the classification applicable to passenger automobiles has remained unchanged.[4] In the late 1960's, as a revenue-producing measure, certain motor carrier tariff associations permitted classification exceptions for automobiles which resulted in higher charges than under published ratings. This prompted a series of claims and legal actions for reparations against individual motor carriers. The carriers thereupon petitioned the National Classification Board, which, after investigation and notice, proposed an increase in classification from 150 to 250 for less-than-truckload (LTL) shipments of passenger automobiles.[5] The proposed schedules, however, were suspended following a protest by the Department of Defense, a major shipper of jeeps, military vehicles, and decedents' automobiles. See 37 U.S.C. § 554(a)-(b) (statute as amended in 1965 to permit shipment of automobiles of deceased Vietnam servicemen at public expense). After a lengthy administrative proceeding, the increase eventually was approved by the ICC in the order here contested.
Plaintiff's primary contention here is that the ICC decision failed to consider adequately cost evidence which would have shown the increase in classification to be economically unreasonable. Defendants argue that cost data is not entitled to probative weight in classification proceedings, and that the ICC's determination relied upon specific automobile characteristics, including handling problems, stowability, susceptibility to damage, and density. While the Court's administrative review function here, under 5 U.S.C. § 706, is a limited one, it is also true that, "[J]udicial deference to expertise is not boundless; and expertise is not sufficient in itself to sustain a decision. The order must be supported by substantial evidence and must be made within the statutory limits placed on the Commission's powers by Congress." Eastern Central Motor Carriers Ass'n v. United States, 239 F.Supp. 591, 594 (D.D.C.1965); cf. Ayrshire Colleries Corp. v. United States, 335 U.S. 573, 592-93, 69 S.Ct. 278, 93 L.Ed. 243 (1949). The Court therefore must analyze precisely the ICC's statutory duties, the precedents on introduction of cost data in classification proceedings, and the evidence in the record supporting the agency's decision.

II. The Role of Cost and Revenue Data in Classification

49 U.S.C. § 316(i) sets forth the ICC's general authority concerning rate and classification matters:
"In the exercise of its power to prescribe just and reasonable rates, fares, and charges for the transportation of passengers or property by common carriers by motor vehicle, and classifications, regulations, and practices relating thereto, *854 the Commission shall give due consideration, among other factors, to the inherent advantages of transportation by such carriers; to the effect of rates upon the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient transportation service by such carriers at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable such carriers, under honest, economical, and efficient management, to provide such service." (Emphasis added).
While the statute on its face appears to mandate consideration of cost and revenue data in both rate and classification proceedings, the ICC has not required cost information or cost justification when evaluating individual proposals for classification increases. Classification proceedings have historically dealt primarily with the qualities and characteristics of commodities, and have accorded little weight to cost and revenue matters. There is support for this approach in the statute's legislative history.[6]
However, the consideration of cost and revenue data has been permitted in certain classification proceedings. As stated in Classification Ratings Based on Density, 337 I.C.C. 784, 789 (1970), "[R]ate and cost information was offered by the protestants challenging the justness and reasonableness of the proposed new rule to show its consequences in terms of impact on traffic and shippers, and to question the proposition espoused by the respondents that the rule was needed to make the light and bulky traffic pay its share of the transportation burden." The ICC found the information to have been properly admitted. Accord, Increased Classification Ratings on Blankets, 341 I.C.C. 760, 766-67 (1972). See also note 3, supra.

III. The Role of Cost and Revenue Data in the Present Case

In the present action, in attempting to show that passenger vehicles were paying their fair share under the existing classification, plaintiff offered into evidence a Government Accounting Office (GAO) audit covering 219 Military LTL shipments of passenger automobiles, Ex. 6 in Administrative Record, and the average variable costs and revenue needs for such shipments, later revised to reflect ICC density adjustment ratios. Exs. 16, 18. The audit included shipments between points in Transcontinental Territory, South-Central Territory, and Southwestern to Eastern-Central Territory. Plaintiff's analysis concluded that the proposed classification increase would result in revenues far in excess of those considered necessary by the ICC to produce a reasonable return for carriers. Defendant NCC disclaimed the importance of cost data in classification matters, challenged plaintiff's records and calculations in cross-examination, and later presented evidence to rebut the accuracy of plaintiff's density computations. The NCC, however, submitted no independent cost studies of its own.[7] The *855 hearing examiner admitted plaintiff's exhibits into evidence but criticized their lack of typicality and currency; she held that, in any event, such cost considerations were entitled to little weight in classification. Doc. O at 7-8. Defendant NCC's cost data was faulted for its improper methodology. Doc. O, App. C.
Plaintiff's cost evidence, of course, was not entitled to controlling weight in the classification proceeding. Nevertheless, we find that the minimal significance attached to this data by the ICC was erroneous. Contrary to the hearing examiner's findings, which were affirmed by the ICC, the GAO audit presents a prima facie valid sampling of nationwide, representative traffic. Over two-thirds of the shipments were between points in Transcontinental Territory or in territories having comparable costs. Since the only evidence in the record indicated that a substantial number, if not almost all, LTL passenger car shipments are by the Government,[8] commercial usage principles justified a survey of military vehicles in order to establish average distances, density, handling problems, interchanges, damage claims, and costs. Cf. Rules to Govern the Assembling and Presenting of Cost Evidence, 337 I.C.C. 298, 387 (1970). The cost-revenue data utilized in the audit was essentially contemporaneous with the shipments studied and could have been easily updated by the ICC when more current data became available  as subsequently recomputed by plaintiff. In short, plaintiff's overall cost analysis was representative of the traffic subject to the classification increase and made a prima facie showing that the existing classification produced a fair return to carriers.
Defendant NCC, as noted, was unable to rebut plaintiff's showing.[9] Whether viewed as non-conformity with 49 U.S.C. 316(g)'s burden of proof requirement or as a failure to go forward with more complete evidence within the NCC's exclusive control, this could not be excused by the ICC once cost matters were placed in issue. Cf. ICC v. New York, New Haven & Hartford R.R., 372 U.S. 744, 760 n. 12, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963). Nor can the various transportation characteristics of passenger vehicles be accepted as per se indicators of cost without a more precise demonstration of what costs each characteristic entails. Cf. Nat'l Small Shipments Traffic Conf. v. United States, supra, 321 F.Supp. at 511. Hardly any itemized cost evidence from the carriers was presented to the ICC or in the reparations cases. Defendant NCC appears instead to have assumed that the problems involved in handling, stowing, and hauling an unusual commodity such as uncrated passenger vehicles automatically justified an increase in revenue to the carriers. These factors, however, were not of recent origin; they were the very same elements that supported the existing classification.
On the other hand, plaintiff, in addition to introducing cost studies, contended before the ICC that military personnel, and not the carriers, routinely load and secure vehicles for transport onto freight vans; that the consignor or consignee under Government regulation (49 C.F.R. §§ 173.1, .120, .250) and carriers' rule (Item 568) must share responsibility for loading *856 and unloading automobiles; that cross-dock handling procedures in interchanges are not overly complicated; that damage claims are not excessive; and that extraordinary pickup and delivery problems, such as shipping from or to private residences, may be compensated through separate tariff charges. These unrefuted assertions substantially undercut the carriers' claims that physical transportation characteristics implicitly demonstrate the costs associated with handling an article. Costs and values cannot be evaluated unless the particular qualities or problems inherent in a commodity are quantified in some explicit, demonstrable manner.[10]
The essential point is that classification is not to be an artifice or an "end around" method of increasing revenue  without supporting cost evidence. Cf. Western Classification Case, 25 I.C.C. 442, 453 (1912) (classification not an instrumentality for revising rates and charges). As was observed over 60 years ago during debate on legislation providing the ICC with specific classification authority, "[C]lassification of freight is just as important as rates, because by moving a particular article from one class to another you affect the rates." 45 Cong.Rec. 4578 (1910) (statement of Rep. Mann). Congressman Russell further explained this viewpoint:
"[T]he shipper can be extorted from; he can be made to pay an unjust rate just as well through classification as he can through the fixing of a rate. The carriers can put an article in one classification, subject to a given rate, and if the Interstate Commerce Commission sees fit to declare that rate unreasonable, and reduce it, declaring what shall be a reasonable rate to take its place, the carrying corporation can obtain the same benefit and put the shipper under the same disadvantage by simply changing the classification of the article." Id. at 5142, quoted in All States Freight, supra, 379 U.S. at 350, 85 S.Ct. 419.

Conclusion
To prevent arbitrary or unreasonable classifications, the ICC as well as the National Classification Board and the National Classification Committee cannot ignore cost and revenue data when a claim is raised, with substantiation, that an existing classification suffices to assure a fair, compensatory return to carriers. Cost and revenue data is one of the factors to receive rational, albeit only proportional, consideration among the various classification factors. This should be especially true when it appears that the carrier by a change in classification is attempting thereby to increase its revenue.
This should not impose an undue hardship upon carriers or upon the ICC. As observed at note 9, supra, cost information is to some extent readily available. Nor does this requirement remove or blur the distinction between classification and rate making. In classification proceedings, the rule is simply that cost and revenue data cannot be denied proportionate consideration when a substantial issue of cost and revenue is raised.
Finding a failure to evaluate adequately cost and revenue data, the Court remands this matter to the ICC for the development and consideration of cost evidence relating to the classification increase. The agency's order of August 15, 1974 is suspended pending further action consistent with this opinion.
Judgment Accordingly.
NOTES
[1] Congress recently enacted new review procedures for ICC orders and decisions, superseding the above provisions. See Act of Jan. 2, 1975, Pub.L. No. 93-584, 88 Stat. 1917.
[2] As explained in the NCC's Motion for Leave to Intervene as a Party Defendant, at 1-2, filed March 14, 1975: "The National Classification Committee is an autonomous standing committee of the National Motor Freight Traffic Association, Inc., a non-profit membership corporation. . . . Pursuant to an agreement approved by the Interstate Commerce Commission under Section 5a of the Interstate Commerce Act, 49 U.S.C. Section 5b, the National Classification Committee is the agency by which some 4,000 motor common carriers of property operating in interstate and foreign commerce under certificates of public convenience and necessity issued by the Interstate Commerce Commission collectively discharge their duty under Section 216(b) of the Act, 49 U.S.C. Section 316(b), to establish, maintain and publish just, reasonable and otherwise lawful classifications of property for rate making purposes and just and reasonable regulations, rules and practices relating thereto. To that end it initiates and participates in proceedings before the Interstate Commerce Commission, other Federal and State regulatory agencies and the Federal Courts involving the lawfulness of the rates, classifications, rules, regulations and practices of carriers rendering transportation and services in connection with transportation in interstate and foreign commerce."
[3] In All States Freight, Inc. v. New York, New Haven & Hartford R.R., 379 U.S. 343, 85 S.Ct. 419, 13 L.Ed.2d 324 (1964), the Supreme Court noted: "The characteristics of a commodity which are generally considered in determining the classification to which it should be assigned are: 1. Shipping weight per cubic foot. 2. Liability to damage. 3. Liability to damage other commodities with which it is transported. 4. Perishability. 5. Liability to spontaneous combustion or explosion. 6. Susceptibility to theft. 7. Value per pound in comparison with other articles. 8. Ease or difficulty in loading or unloading. 9. Stowability. 10. Excessive weight. 11. Excessive length. 12. Care or attention necessary in loading and transporting. 13. Trade conditions. 14. Value of service. 15. Competition with other commodities transported." Id. at 345 n. 2, 85 S.Ct. at 421. (citing Motor Carrier Rates in New England, 47 M.C.C. 657, 660-61 (1948)). See also Director General v. Viscose Co., 254 U.S. 498, 503, 41 S.Ct. 151, 65 L.Ed. 372 (1921); Class Rate Investigation, 1939, 262 I.C.C. 447, 508-09 (1945); cf. New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947).

A recent case has indicated, "The first twelve classification characteristics [enumerated in All States Freight, supra] are related to cost and serve to make a fairer distribution of the total burden. The last three relate to the ability of the article to bear the charges." Nat'l Small Shipments Traffic Conf. v. United States, 321 F.Supp. 500, 511 (S.D.N.Y.1970), on remand, 350 I.C.C. 586 (1975).
[4] Memorandum of the ICC in Support of its Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, at 9, filed January 22, 1976.
[5] See generally National Classification Committee Agreement, 299 I.C.C. 519 (1956) (authority and function of National Classification Board and of National Classification Committee). The Board also proposed a 3500 pound minimum weight for LTL shipments and an increase in classification of truckload shipments from 100 to 125. The ICC found these proposals unsupported by the evidence. No appeal has been taken from these rulings.
[6] 49 U.S.C. § 316(i), as amended, is patterned upon 49 U.S.C. § 15a(2). See H.R.Rep. No. 2832, 76th Cong., 3d Sess. 79 (1940) (rule of ratemaking standardized for motor carriers); see also 49 U.S.C. § 15a(1). 49 U.S.C. § 15a(2) replaced a complex method of annually valuating railroad property in order to compute the permissible fair rate of return. Compare Transportation Act of 1920, § 422, 41 Stat. 456, 488. The statutory factors listed are intentionally non-specific and allow the ICC considerable latitude in prescribing just and reasonable rates. See H.R.Rep. No. 193, 73d Cong., 1st Sess. 30 (1933); 77 Cong.Rec. 4259 (1933) (remarks of Sen. Dill, floor manager of measure). As part of the Emergency Railroad Transportation Act of 1933, the provision was mainly an attempt to generate more adequate revenues for the railroads by removing rigid rate barriers and an unworkable recapture scheme. Cf. United States v. Chesapeake & Ohio Ry., ___ U.S. ___, ___-___, 96 S.Ct. 2318, 49 L.Ed.2d 14, 44 U.S.L.W. 4869, 4877-78 (1976) (Stevens, J., dissenting). The reports and floor debate are silent concerning the procedures and criteria to be used in establishing just classifications  traditionally developed without any cost considerations.
[7] Doc. J at 298-99; Ex. 20 (verified statement of John C. McWilliams). Defendant NCC's position throughout the administrative proceeding was that cost considerations were totally irrelevant in classification proceedings. See, e. g., Doc. B at 9-10; Doc. I at 279-80; Doc. J at 357-58; Doc. L at 46-47; Doc. Q at 36-39.
[8] Ex. 1, App. A (Lucore Statement).
[9] This was clearly not for lack of information or resources. NCC has access to carriers' freight records reflecting routes, loads, spotting instances, actual handling costs, interchange expenses, and revenue figures. Such general information must be introduced by carriers in ratemaking proceedings. The ICC's Section of Cost Finding has developed Highway Forms A and B to assist in determining freight costs and has published numerous reports and tables on cost computations. Moreover, the carriers have their own cost research arm, which was called upon to justify the increases herein under the economic stabilization program. With the termination of the program, the need for such cost justification became moot. Cf. Carpenters 46 County Conf. Bd. v. CISC, Em.App., 522 F.2d 637, 640 (1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1724, 48 L.Ed.2d 194 (1976); United States v. California, Em.App., 504 F.2d 750 (1974), cert. denied, 421 U.S. 1015, 95 S.Ct. 2423, 44 L.Ed.2d 684 (1975).
[10] Nor are density calculations to be given a talismanic effect in classification proceedings. See Incandescent Electric Lamps or Bulbs, 47 M.C.C. 601, 606-08 (1947); Classification Ratings Based on Density, supra, 337 I.C.C. at 799. In classification, "None of the principles or elements [i. e., transportation characteristics] should be controlling, but all that are relevant should be considered." Class Rate Investigation, 1939, supra, 262 I.C.C. at 508.