NATIONAL CLASSIFICATION COMMITTEE and National Motor Freight Traffic Association, Inc., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

No. 81–1600.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 26, 1982.
Decided Dec. 28, 1982.

121. Brief for Petitioner at 23–24.

122. *Id.* at 24.

William W. Pugh, Washington, D.C., with whom John R. Bagileo, Washington, D.C., was on the brief, for petitioners.

H. Glenn Scammel, Atty., I.C.C., Washington, D.C., with whom Richard A. Allen, Gen. Counsel, Kathleen M. Dollar, Associate Gen. Counsel, I.C.C., Robert B. Nicholson and Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

Before EDWARDS, Circuit Judge, DAVIS *, Circuit Judge for the United States Court of Appeals for the Federal Circuit, and McGOWAN, Senior Circuit Judge.

Opinion for the court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

The National Motor Freight Traffic Association, Inc. (NMFTA) and an autonomous standing committee of that organization, the National Classification Committee (NCC), appeal from the Interstate Commerce Commission's (ICC's) rejection of a proposed change in the classification of furnaces for purposes of computing freight charges when furnaces move by truck. Finding merit in several of petitioners' contentions, we remand to the ICC for further proceedings.

## I

The National Motor Freight Classification (NMFC) governs the nationwide tariffs applicable to the shipment of goods by motor common carriers ("truckers") operating under certificates of public convenience and necessity. An ICC-approved agreement among truckers directs the NCC, composed of 100 elected representatives of parties to the agreement, to maintain and make appropriate changes in the NMFC, thereby fulfilling their statutory duty to establish rates and classifications, 49 U.S.C. § 10702(a) (Supp. IV 1981). *National Classification Committee—Agreement*, 299 I.C.C. 519 (1956). The NCC receives help in processing proposals for changes in classification matters from a group of experts it appoints, the National Classification Board (NCB).

To summarize how the NMFC works, rates for shipping a given item of freight are determined by the item's classification and its corresponding class rate or tariff. "The primary purpose of a freight classification is to assign each article, or a group of articles, to a class according to well-known

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

classification principles or elements which recognize distinctions from a transportation standpoint, along fairly broad lines, in order to meet the needs of commerce." *Class Rate Investigation, 1939*, 262 I.C.C. 447, 508 (1945). The NCC must consider 15 characteristics of a commodity before assigning it a classification.[1] Once an item's classification is known, the freight charge is computed according to the corresponding class rate, the item's weight, and the distance to its destination.

The NMFTA, agent for publication of the NMFC, filed a proposal with the ICC to change the classifications for furnaces (item 26280 series), including mixed-truckload shipments of furnaces and certain related commodities (item 26300 series). The proposal, originally scheduled to become effective April 19, 1980, would have bumped these shipments into a higher classification for both truckload and less-than-truckload shipments.[2] In effect, the change would have increased freight charges on these goods. On April 2, 1980, members of the furnace industry petitioned the ICC to suspend implementation of the proposal and to investigate whether the rates were reasonable as required by 49 U.S.C. § 10701(a) (Supp. IV 1981). Joint Appendix ("J.A.") 1; *see* 49 U.S.C. § 10708 (Supp. IV 1981) (establishing procedures for investigation and suspension). The ICC granted the request on April 16, 1980.[3] J.A. 28. On April 21, 1980, the ICC set the matter for hearing on the basis of written pleadings under 49 C.F.R. §§ 1100.43–.53 (1981). J.A. 30. By statute the truckers' representative in such a proceeding bears the burden of proving that the proposed change is reasonable. 49 U.S.C. § 10708(c) (Supp. IV 1981).

### A. The Review Board's Decision

On November 26, 1980, a three-person review board[4] (Member Fisher dissenting) held that the NCC had not shown the classification change to be reasonable. J.A. 184 (I. & S. Docket No. M–30240 F). The decision began by summarizing the opposing sides' contentions with respect to each of the fifteen transportation characteristics that are to be considered in assigning classification ratings. *See supra* note 1. It then discussed those characteristics about which

---

1. 1. Shipping weight per cubic foot.
 2. Liability to damage.
 3. Liability to damage other commodities with which it is transported.
 4. Perishability.
 5. Liability to spontaneous combustion or explosion.
 6. Susceptibility to theft.
 7. Value per pound in comparison with other articles.
 8. Ease or difficulty in loading or unloading.
 9. Stowability.
 10. Excessive weight.
 11. Excessive length.
 12. Care or attention necessary in loading and transporting.
 13. Trade conditions.
 14. Value of service.
 15. Competition with other commodities transported.
All States Freight, Inc. v. New York, New Haven & Hartford R.R., 379 U.S. 343, 345 n. 2, 85 S.Ct. 419, 421 n. 2, 13 L.Ed.2d 324 (1964); *accord* Motor Carrier Rates in New England, 47 M.C.C. 657, 660–61 (1948). The fact that all characteristics should be considered, however, does not mean that all will be relevant in determining the ultimate classification for a particular item.

2. Commodities in the item 26280 series are currently rated LTL (less-than-truckload) 77½, TL (truckload) 60 (minimum weight 16,000 pounds), and TL 45 (minimum weight 24,000 pounds). The proposal sought the following ratings: LTL 85, TL 70 (minimum weight 15,000 pounds), and TL 50 (minimum weight 22,000 pounds). In mixed truckloads described in the item 26300 series, the present ratings are TL 60 (minimum weight 16,000 pounds) and TL 45 (minimum weight 24,000 pounds). The proposal sought TL 70 (minimum weight 15,000 pounds) and TL 50 (minimum weight 22,000 pounds). Thus, the proposal would have raised TL and LTL ratings, though it would have lowered the minimum weights needed to trigger the discount rating available for truckload shipments.

3. The ICC order postponed the proposal's effective date until November 18, 1980. J.A. 29. Later, the truckers voluntarily postponed the effective date until December 25, 1980. *See* J.A. 184.

4. Despite the connotations "review board" might otherwise have, one should keep in mind that this was the agency's initial decision in this matter.

"[s]ubstantial issues" were raised, J.A. 186: (1) trade conditions; (2) excessive weight, and ease or difficulty in loading and unloading; (3) care and attention needed in loading, and liability to damage; (4) susceptibility to theft; (5) density and value; and (6) stowability.

The Review Board considered and rejected the NCC's arguments designed to show that factors in each of the first three categories made furnaces less favorable than other freight from a transportation standpoint. (Although it declined the invitation to deem these features unfavorable, the Board did not say that they were favorable either.) As for the fourth category, the Review Board credited furnaces with a slight transportation advantage: the NCC had failed to refute an assertion by the furnace industry that, owing to "their size and weight," furnaces were less susceptible to theft than were most commodities. *Id.* at 187.

The fifth and sixth categories—density and value, and stowability—received the most attention and ultimately formed the battleground for the present appeal. Before we discuss the Review Board's findings in these areas, it may be helpful to explain why, other things being equal, freight with lower densities generally bear higher classification ratings. Consider the relative shipping burdens of a truckload of feathers versus a truckload of bricks. Although some of the bricks' other transportation characteristics might be unfavorable (for instance, they might be relatively more difficult to load), strictly from the standpoint of density one would generally want to charge a higher rate for the feathers than for the bricks. Truckers would feel slighted otherwise, because application of the same rate-per-hundred-pounds would lead to gross revenue disparities between two separate shipments that might have filled the same truck and travelled the same distance. In the parlance of the ICC, feathers would not then have borne their fair share of the transportation burden.[5]

The NCC cited several ICC cases for the proposition that density was "a critical transportation characteristic," J.A. 50. *Motor Freight Classification Ratings on Medical Kits,* I. & S. Docket No. M–29116 (Apr. 7, 1977) (not printed); *Classification Ratings Based on Density,* 337 I.C.C. 784 (1970); *Incandescent Electric Lamps or Bulbs,* 44 M.C.C. 501 (1945), *modified,* 47 M.C.C. 601 (1947), 48 M.C.C. 195 (1948). Both sides agreed that the average density of the relevant furnaces was 11.5 pounds per cubic foot, and the average value $1.65 per pound. The NCC offered exhibit G of its opening statement to show that an average density of 11.5 was low even for selected commodities bearing the higher less-than-truckload rating proposed for furnaces (LTL 85); furnaces' average value was said to fall within the middle of those for the selected commodities, J.A. 188; *see* J.A. 65. Exhibit H, a listing of selected commodities bearing furnaces' current LTL class rating, showed that furnaces had a lower average density than any compared item; the average value of furnaces was on the high side of this list. J.A. 66. Finally, the NCC showed that competing products generally bore a rating of LTL 85 or higher, the only exceptions being items notably more dense and less valuable than furnaces. *See* J.A. 188.

The NCC offered additional evidence on rebuttal. The furnace industry had objected to the relevance of exhibits G and H on the ground that they listed only the densities and values of the selected items, ignoring the thirteen other transportation characteristics. Consequently, the NCC offered rebuttal exhibits A and B which supplied information about each previously-omitted characteristic for the commodities listed in opening exhibits G and H. J.A. 133–35. With few exceptions, each characteristic was said to be normal, or the commodity was said not to be subject to the identified condition.

In response the Review Board said first that, "[w]hile evidence presented by NCC might appear at first glance to justify the proposed *LTL* classification, we note that

5. *See* Motor Carrier Rates in New England, 47 M.C.C. 657, 660 (1948).

no comparisons were offered with respect to the proposed *truckload* and *mixed truckload* ratings." J.A. 188 (emphasis added). Beyond this lack of proof, the opinion later noted evidence suggesting that the proposed truckload and mixed-truckload ratings might actually be inappropriate. As for truckload ratings, the Review Board pointed out that only one of the items from LTL 85 selected for comparison in exhibit G bore a truckload rating or minimum weight requirement similar to the ones proposed for furnaces.[6] As for mixed-truckload shipments, the Review Board noted that furnaces were grouped with items such as fire brick, furnace cement, and sheet steel. "[T]he inclusion of these relatively dense items," the Board found, "could raise the average density of mixed truckloads considerably above the average density of the furnaces alone." J.A. 189. All told, the Board thought it lacked evidence to conclude "that the proposed increased truckload and mixed truckload ratings could be justified on the basis of density or value." *Id.*

Moreover, notwithstanding the appeal "at first glance" of the NCC's LTL presentation, the Review Board was ultimately unpersuaded.

> NCC compares only two of the 15 transportation characteristics for the Items which cover such disparate commodities as shoestring potatoes in glass containers and egg coloring kits. While a comparison of all pertinent characteristics for items classed 85 and 77½ with which a comparison is made is submitted on rebuttal, this information should have been submitted initially as part of the case-in-chief and will not be considered. We do not think the limited presentation made by NCC here is sufficient to sustain the conclusion that the proposed increased

LTL rating is justified on the basis of density and value.

*Id.* at 188.

On the issue of stowability, the NCC contended that furnaces do not fill a truck as well as other freight might, because they cannot be stacked on top of each other and because they can only be loaded with light density commodities. The furnace industry, however, presented photographs showing instances in which furnaces were successfully double-tiered. Thus, "[w]hile it may be possible that some furnaces may not be double tiered," the Board said, "we have no way to determine from the evidence presented here how often this situation occurs." *Id.* at 189. In the Board's view, the evidence of possible stacking also rebutted the argument that furnaces could only be loaded with light-density freight, since "furnaces generally weigh in excess of 150 pounds." *Id.* The Board found further evidence that dense items could be loaded with furnaces in the fact that the mixed-truckload tariff grouped furnaces with "such dense items as bricks and sheet steel." *Id.*

The NCC attempted on rebuttal to admit further evidence and argument pertaining to stowability. The rebuttal presentation began by referring to testimony before an earlier NCB hearing by "furnace manufacturers including several of those who are now serving as witnesses." J.A. 86. Evidence at that earlier hearing had shown that average shipments of furnaces weighed approximately 18,000 pounds and that only rarely did they reach 24,000 pounds. Based on the assumption that the average trailer contains 2,548 cubic feet and "normally" loads to all but 10 percent of capacity (assumptions derived from *Increased Minimum Weights for Truckload Ratings, NMFC*, I. & S. Docket No. M–30073 (Mar. 11, 1980) (not printed)), a few computations led the NCC to conclude that the "loaded density" of furnaces was only

---

6. The one exception was water heaters, rated TL 70 (minimum weight 15,000 pounds). While conceding that the value of water heaters was only one-eighth that of furnaces, which would suggest that furnaces might carry even higher TL ratings than were proposed, the opinion noted that NCC failed to provide information in its initial presentation about water heaters' other characteristics. J.A. 188. Thus, even the exception was thought not to be thoroughly enough documented to support the TL and minimum weight ratings sought.

7.5 pounds per cubic foot for loads of 19,000 pounds[7] and 9.4 for any load that might reach 24,000 pounds. By contrast, the computations showed that freight with an average density of 11.5 would normally load to a density of 10.4. J.A. 84–98.

The Review Board responded:

Normally we would find the argument persuasive that, at least in truckload quantities, furnaces have poor stowability. However, we note that all the information on which the computations of loadability are based was available at the time NCC's initial statement was filed, and we think that it should have been presented ini[ti]ally in order to allow protestants a chance to address this matter.

*Id.* at 189. The Board then concluded without further elaboration that the "tariff schedules under investigation are not shown to be reasonable." J.A. 190.

Member Fisher lodged a short dissent, which agreed with "all of the procedural . . . findings," but concluded nonetheless "that respondents have justified their reliance upon three transportation characteristics, density, value, and stowability, in classifying this commodity. In my estimation these transportation characteristics must be given preponderant weight in this proceeding and their consideration amply justifies the proposal." *Id.*

B. *Decision on Appeal to Division 2*

On December 31, 1980, the NCC submitted a "Petition for Reconsideration Embracing Petition to Re-Open the Record." *Id.* at 191; *see* 49 C.F.R. § 1100.98(b) (1981) (appeal of right from initial decision). One significant part of the petition was the NCC's contention that the Review Board improperly excluded rebuttal evidence. According to NCC, exhibits A and B of the reply statement, which added information about the thirteen additional transportation characteristics for the selected commodities bearing the current or proposed classifica-

tions, were simply "intended to rebut the protestants' contention that [the initial comparisons based on density and value alone] were inconclusive." *Id.* at 200. The evidence and argument on stowability were properly submitted on rebuttal, NCC claimed, because they made use "of prior testimony to contradict the testimony now offered by some of these same witnesses and the same companies who are now testifying on behalf of the [furnace industry]." *Id.* at 207. Moreover, the NCC noted that its opening statement had included the assertion that the average weight for truckload shipments of furnaces was approximately 18,000 pounds and that manufacturers had stated that their products rarely loaded to 24,000 pounds. *Id.* at 208; *see id.* at 59–60. These, of course, formed the starting point for the NCC's rebuttal computations about loaded density.

Drawing on prior ICC cases, the NCC argued that rebuttal evidence need only "tend[ ] to rebut" or be "reasonably responsive" to the other side's evidence to be admissible. *Id.* at 202. Because it believed its rebuttal evidence satisfied this test, the NCC urged that the record be "amended" to include the rebuttal evidence. *Id.* at 248. In the alternative, the NCC asked that the evidence be accepted and the furnace industry given a chance to respond as though the evidence had been offered initially. *Id.* at 194–95, 248.

Only one other NCC contention is relevant to this appeal. To refute the Review Board's finding that truckloads of furnaces mixed with other items would be more dense than 11.5, the NCC argued (1) that it "must assume" that the 11.5 figure was an average for the whole range of products in the item 26280 series, which included at least some of the heavy items (like fire brick and furnace cement) that could be moved in mixed-truckload shipments under the item 26300 series; and (2) that the experience of some truckers showed that average mixed-truckload shipments were in

---

7. The average weight of furnace shipments, as computed from testimony at the NCB proceeding, was said to be 18,234 pounds. 19,000 was used as a " 'rounded' " figure that would give "the furnace manufacturers the benefit of every possible doubt." J.A. 92.

fact only slightly heavier than average shipments of furnaces alone. *Id.* at 230–31.

Division 2 of the ICC denied the NCC's petition on April 27, 1981. We quote at length from the relevant portions of the opinion, because its meaning is disputed on this appeal. The first relevant section discusses the importance of the density showings the NCC made in its case-in-chief.

> The only compared class-85 commodity which seemed to have a configuration or shape like furnaces was water heaters. Most of the others were completely dissimilar, such as dish mops, marshmallow candy, shoestring potatoes, kites, and various types of kits.
>
> As a result, the Board generally discounted the comparison because of respondent's failure to submit a comparison on the basis of all transportation characteristics. Respondent cites precedent where density was emphasized as the most important transportation characteristic. However, here, we agree that reliance on this factor is inadequate due to the tremendous practical dissimilarities between most of the compared commodities and the furnaces. Furthermore, shipments of furnaces in truckloads could, under the proposed tariff provision, be mixed with other related commodities, resulting in overall heavier and more dense shipments. This does not support a classification rating designed for light density articles.

*Id.* at 252–53. The opinion continued:

> Moreover, in our opinion, respondent's attempt to cure this deficiency with rebuttal evidence was not proper. Respondent was not taken by surprise, since it initiated the proposed change in the classification rating on furnaces and had a choice of how it would defend the proposal. The fact that it did not make an adequate case does not justify violating the Rules of Practice. See 49 C.F.R. § 1100.49, requiring a complainant, and by analogy a respondent, to include in its opening statement 'all the evidence' on which it relies.

Respondent cites another recent decision [*Motor Freight Classification Ratings on Medical Kits,* I. & S. Docket No. M–29116 (Apr. 7, 1977) (not printed)] where this same respondent was permitted to supplement the record with rebuttal evidence in response to protestants' arguments. However, the instant case is distinguishable in that respondent is attempting to cure deficiencies in its case-in-chief by evidence that was not only late-filed but does not substantially improve the offered justification. [The Division here cites a case where rebuttal evidence,] even if accepted, was insufficient to meet complainant's burden of proof.

For example, exhibits 'A' and 'B' in respondent's reply are a relisting of the compared commodities taking classes 85 and 77½ ratings, with all 15 transportation characteristics set forth for each of them. However, according to respondent, the end result is the same as in its case-in-chief, namely, that the other transportation characteristics are not determinative, leaving only density as controlling . . . . As pointed out above, relying solely on density when completely unlike articles are involved, does not justify similar classification ratings on them.

The other major rebuttal evidence consisted of a transcript of a hearing before the classification board of respondent's organization, in which some of these same witnesses for protestants argued that the loadability/stowability of furnaces are worse than they are now willing to admit. However, respondent previously . . . summarized data from those hearings in its opening statement. Therefore, not only was the detailed transcript late-filed but its basic content had already been considered through the summary, submitted in respondent's case-in-chief. It was not sufficient to weigh the decision in respondent's favor.

*Id.* at 253–54.

"In summary," the Division finally held, "the greatest shortcoming in respondent's evidence, which is not cured by the subsequently tendered evidence, was the failure

to compare furnaces with commodities (except somewhat similar water heaters) that from a practical and realistic standpoint are like furnaces and would, thus, involve similar transportation requirements." J.A. 256.

### C. *Discretionary Review Before the ICC*

On May 26, 1981, the NCC filed a "Petition Seeking a Finding of General Transportation Importance." J.A. 257; *see* 49 C.F.R. § 1100.98(c)(2)(ii) (1981). The NCC read the Division's opinion as holding that density comparisons could validly be made only with items similar "from a practical and realistic standpoint," or more specifically, similar in "configuration or shape." This holding, the NCC argued, injected into classification proceedings a novel consideration at odds with past precedent. J.A. 266.

In a one-page decision issued June 18, 1981, the ICC denied the petition. "[I]n our opinion," the decision held, "the assailed decision is consistent with the usual standards and, based on the record, is correct." *Classification Ratings on Furnaces, NMFC,* I. & S. Docket No. M–30240 (June 18, 1981) (not printed). Without specifically addressing the NCC's concerns, the ICC stated that the NCC "failed to prove that furnaces should be rated class 85 from the evidence presented, mainly comparisons of density," and that mixed-truckload shipments might actually be heavier than shipments generally rated LTL 85. *Id.*

### II

On appeal, the NCC reiterates three arguments it raised during the agency's deliberations. First, it argues that the Division held the NCC to a new but unexplained requirement: that the density of furnaces be compared not to the densities of items in the proposed class generally but to the densities of items that look like furnaces. Second, it attacks the agency's treatment of the evidence the NCC offered on rebuttal. Third, it contends that the agency erroneously concluded that mixed truckloads of furnaces and other items would be denser than 11.5 pounds per cubic foot. We find that the NCC's first two arguments have

merit and remand to the agency to render a decision that does not suffer from the flaws that plague the Division's opinion in these respects. Because we find the first two arguments sufficient to justify a remand, we do not fully reach the NCC's third argument, though we do caution the agency about its failure to address the NCC's objections on this point. We address each of the NCC's arguments in turn.

The NCC's critique of the Division's density discussion begins, as noted earlier, with the Division's remark that exhibit G, listing the average densities and values of items rated LTL 85, mainly included items that were "completely dissimilar," the only item with a similar "configuration or shape" being water heaters. J.A. 252. The NCC then argues that later references to "practical dissimilarities," *id.* at 253, "completely unlike articles," *id.* at 254, and items similar "from a practical and realistic standpoint," *id.* at 256, voice the view that the NCC cannot merely classify furnaces according to their fifteen transportation characteristics but must group them with items that look like furnaces. Such a requirement, they maintain, would do damage to the logic of the classification scheme, which is concerned with the similarity of items as they are packaged for shipment, not as they look on the retail shelf. *See Dutton-Lainson Co. v. United States,* 371 F.Supp. 1352, 1355–56 (D.Neb.1974) (fact that winches are complex and have moving parts is of minimal significance in establishing classification when the moving parts are boxed for shipment). They cite instances in which the ICC has found density and value comparisons dispositive, even though the comparisons involved items that otherwise seemed unlike. *E.g., Tobacco Merchants Ass'n v. Atchison, Topeka & Santa Fe Ry.,* 173 I.C.C. 795 (1931); *American Hatters & Furriers Co. v. Central New England Ry.,* 115 I.C.C. 283 (1926).

The government implicitly concedes, and we have no trouble finding, that if this were what the opinion meant, the Division would at least have had to explain its apparent departure from past practice. The

government maintains, however, that the Division was simply insisting that all fifteen transportation characteristics be considered. Practical dissimilarities were noted only because the Division was not prepared to assume, without further proof, that dissimilar items would have similar transportation characteristics. On this view, dissimilarity of the compared items was merely a proxy for judging the other transportation characteristics, which the NCC failed adequately to document: "if anything, [dissimilarity] increased the likelihood that the other 13 factors would not parallel the characteristics of furnaces in any way." Joint Brief of ICC and United States at 13. Put another way, the Division was not using this notion to show a failure of proof on density but rather an absence of proof on the other characteristics.

As a reviewing court, our role is the limited one of ensuring that the ICC's decision is supported by substantial evidence and is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (E) (1976); see United States v. United States, 417 F.Supp. 851, 853 (D.D.C.1976) (per curiam). Judgments about the proper classification of freight require a complex balancing of many factors, a balance that must be struck by the agency, not the courts. For this very reason, however, a reviewing court may not "accept appellate counsel's post hoc rationalizations for agency action." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Were we to affirm an agency's decision by ignoring reasons the agency actually used and substituting reasons of our own, we would "intrude upon the domain which Congress has exclusively entrusted to an administrative agency," Securities and Exchange Comm'n v. Chenery Corp., 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

 This is not to say, of course, that a reviewing court is to niggle over an agency's presentation of its reasons for decision. And in the circumstances of this case, we are inclined to credit the government's unobjectionable version of the agency's reasoning if at all possible, especially since the ICC on discretionary review found the Division opinion consistent with normal standards. Yet even giving the government every benefit of the doubt, we are convinced that its suggested meaning cannot be grafted upon the agency's actual reasoning. We thus remand to the agency to clarify and defend the considerations that led it to the present result, if indeed it reaches the same result on remand.

To understand how we reach this conclusion, it is important to remember first what the NCC did and did not address. If we ignore for now the evidence it submitted on rebuttal, the NCC did indeed evaluate only two of the fifteen transportation characteristics for items other than furnaces, that is, for selected commodities bearing furnaces' current and proposed ratings. The NCC did, however, discuss all fifteen transportation characteristics for furnaces themselves. We note that this is similar in form to the presentation in Motor Classification Ratings on Candy or Confectionery, 353 I.C.C. 314 (1977), in which a division of the ICC approved an increase in the rating applicable to a certain kind of candy. There, the NCC canvassed six of the characteristics relevant to candy but apparently provided only information about density and value for selected items bearing the present and proposed ratings. The Division there held that two of candy's characteristics were unfavorable, one favorable; the additional characteristic of density, however, deserved in that case "the single most important consideration for purposes of just and reasonable classification." Id. at 332.

With this in mind, we note an initial problem with the government's reading of the Division's opinion. Even if practical dissimilarities were simply noted as a way of speculating about thirteen transportation characteristics in the absence of other proof, the Division failed to explain why it found the absence of other proof significant. That is, we are not told why it insisted on having information about these thirteen additional transportation characteris-

tics for goods rated LTL 85, when it did not insist on analogous proof in the *Candy* case.[8] We do not say it is necessarily inappropriate to require information about all transportation characteristics for certain commodities in the proposed class as well as for the commodity to be classified. Yet imposition of this requirement appears to depart from recent precedent, and we are entitled to know the reasons for the apparent inconsistency. *See Baltimore & Annapolis R.R. v. Washington Metropolitan Area Transit Comm'n,* 642 F.2d 1365, 1370 (D.C. Cir.1980); *Columbia Broadcasting System, Inc. v. FCC,* 454 F.2d 1018, 1026 (D.C.Cir. 1971).

Thus, even the government's reading of the Division's opinion raises problems. More serious, however, is that the government's version is impossible to reconcile with the Division's contention that the rebuttal evidence on density would not have aided the NCC's case even if considered. The opinion notes that, even with rebuttal exhibits A and B,

> according to [the NCC], the end result is the same as in its case-in-chief, namely, that the other transportation characteristics are not determinative, leaving only density as controlling [citing petition]. As pointed out above, relying solely on density when completely unlike articles

are involved, does not justify similar classification ratings on them.

J.A. 254. Obviously, if evidence of all transportation characteristics for commodities in the proposed class were *admitted,* a continued insistence on comparison to similar items could no longer reflect a wish that evidence about other transportation characteristics were known.

In context, therefore, this passage can only mean that (1) density will not be accorded controlling weight unless it is shown that "similar" items in the proposed class have the same average density, and (2) by "similar" the Division means something more than similarity from the standpoint of their transportation characteristics.[9] Although we cannot be sure that such a requirement is indefensible, we are sure that it has not been defended, either by contemporaneous agency explanation or by argument on appeal. We thus remand to the agency so that it will reach a decision on grounds more in accord with the normal standards or explain and justify its apparently new approach.

### III

We find an additional reason for remand in the Division's treatment of certain rebuttal evidence. When the Division argued

8. We note that Member Fisher, dissenting from the Review Board's opinion, seemed to think that the NCC did not need to provide information about the thirteen characteristics for items other than furnaces. His agreement with the Review Board's "procedural ... findings" presumably included the Board's decision to exclude exhibits A and B on rebuttal. Nonetheless, he believed that the NCC had shown the proposed classification change to be reasonable. J.A. 190.

9. Although this passage alone would seem to illuminate the Division's unexplained new requirement, prior language that might otherwise be stretched to cover the government's version seems more clearly to voice the objectionable meaning when read in light of this rebuttal contention. For instance, immediately after discussing the shortcomings of exhibit G, the Division noted the NCC's argument that density should be controlling (and, presumably, that any omissions in exhibit G should therefore not matter). "[H]ere," the opinion answers, "we agree that reliance on this factor [density] is

inadequate due to the tremendous practical dissimilarities between most of the compared commodities and the furnaces." J.A. 253.

On its face, this reference to "practical dissimilarities" seems unlikely to mean "proven or imputed differences in transportation characteristics other than density." For one thing, the passage immediately follows references to dissimilarities in "configuration or shape." For another, such a reading would make the Division's answer merely conclusory: one does not answer the contention that similarities in density are more important than possible differences in other characteristics by saying that there are differences in other characteristics. If these objections to the government's version would be, in the absence of the Division's later rebuttal contention, insufficiently receptive to the possibility that the Division was being merely sloppy or inartful, we have less trouble attributing to this passage its apparent meaning when that meaning is consistent with the Division's later rebuttal argument.

that the rebuttal evidence was "not only late-filed but [would] not substantially improve the offered justification," it did not offer the two points as alternative holdings. *Contra* Joint Brief of ICC and United States at 22 n.8. The argument that the rebuttal evidence was not persuasive was the Division's only attempt to distinguish a case NCC had cited, *Motor Freight Classification Ratings on Medical Kits,* I. & S. Docket No. M–29116 (Apr. 7, 1977) (not printed), which purportedly showed that evidence of this sort was properly submitted on rebuttal. Given that the Division offered no further reasons for its belief that *Medical Kits* did not control, we cannot be sure that the Division would have followed the Review Board's hard line on the submission of rebuttal evidence had it found mistaken its own reasons for thinking that the late-filed evidence would not have helped the NCC's case.

We have already explained the problems we find with the Division's explanation why the rebuttal evidence on density would not have enhanced the NCC's proof. Our focus here is thus on the Division's treatment of the rebuttal evidence concerning stowability. On this point, the Division first stated that a summarized form of the data submitted on rebuttal in fact appeared in the NCC's case-in-chief. This is not far from the truth. In a section defending the NCC's proposed lowering of minimum weight requirements for its increased truckload ratings, the NCC's opening statement did mention that furnace manufacturers had maintained that their products would not load to the existing 24,000 pound minimum but rather loaded to an average of approximately 18,000 pounds. This was not so much a summary of the stowability arguments later submitted on rebuttal as it was a mention of the starting point for these calculations on loaded density. As will be recalled, on rebuttal the NCC documented some additional assumptions that enabled it to calculate the loaded density of truckloads of furnaces weighing 19,000 pounds [10] or 24,000 pounds.

Our point, though, is not to quibble with what a "summary" is. For the Division went on to say, "[t]herefore, not only was the detailed transcript late-filed but its basic content had already been considered through the summary, submitted in [the NCC's] case-in-chief. It was not sufficient to weigh the decision in [NCC's] favor." J.A. 254. Taking the plainest meaning of this statement—that the *Review Board* had considered the summarized evidence and found it lacking—one can only conclude that the Division was mistaken. For one thing, the Review Board did not consider the rebuttal evidence; it thought instead "that it should have been presented ini[ti]ally." [11] J.A. 189. Moreover, the Review Board said explicitly that, on the basis of the loaded density calculations, "[n]ormally we would find the argument persuasive that, at least in truckload quantities, furnaces have poor stowability." *Id.* Thus, if the Review Board had considered the evidence it would have found it helpful to the NCC's proposal.[12]

10. *See supra* note 7.

11. Contrary to the government's assertion, Joint Brief of ICC and United States at 22 n.8, there is no evidence that the Board, though ignoring the calculations, nonetheless considered and rejected the starting point for the calculations, i.e., the evidence that truckloads of furnaces averaged 18,000 pounds but never reached 24,000 pounds. As far as we can tell, the Review Board did not appreciate the significance of those bare numbers until they were developed in rebuttal (with the help of assumptions not contained in the case-in-chief). Indeed, the Review Board seemed not even to realize that the numbers had been presented initially; those were the figures that had been developed in an NCB hearing which were not considered "reliable in the absence of rebuttal by [the furnace industry]." J.A. 189. Had the Board understood that they were presented initially, it would have realized that the furnace industry did indeed have a chance to refute those bare numbers (though not the later calculations). Finally, as we argue momentarily, every indication was that the Review Board did not find the NCC's argument persuasive, once it knew the argument's contours.

12. The NCC makes a similar argument with respect to the Division's treatment of the rebuttal evidence on density, this in addition to the arguments we treated in part II *supra.* It says that the Review Board indicated that the rebut-

The government suggests another reading of this passage, Joint Brief of ICC and United States at 17, 22 n.8: when it said that the evidence "was not sufficient," the Division was making its own judgment that the evidence was unpersuasive. We doubt that the Division was evaluating the evidence here anew. But if it was, this one sentence would be the sum total of the Division's explanation why the stowability evidence was unconvincing. Especially given that the Review Board had been favorably impressed by this argument, we could not view this conclusory statement as an explanation sufficient to support the Division's finding on this point.

 Thus, the Division was either grossly mistaken, or unacceptably curt, in offering its reasons for finding the rebuttal evidence on stowability unimportant. Because its endorsement of the Review Board's refusal to consider this rebuttal evidence depended on this analysis, we have no choice but to remand to the agency to decide how it thinks the evidence should be treated in light of the flaws we have expressed in its earlier reasoning. Once again, we stress that our holding here does not express a view that the rebuttal evidence had to be accepted, or that once accepted it would carry the day. We only hold that the Division's opinion is internally flawed and that the agency must try once more to decide this case in a way that can convince a reviewing court that its disposition is supported by substantial evidence and is not arbitrary or capricious.

IV

As noted earlier, the NCC challenged before the Division the Review Board's finding that mixed truckloads of furnaces would be considerably denser than shipments of furnaces alone. According to the NCC, the 11.5 average density figure al-

ready included some of the dense items that could move in mixed truckloads with furnaces, and the experience of some truckers suggested that the average mixed load was not much heavier than the average load of furnaces alone. J.A. 229–31. The Division ignored this objection. It simply restated the Review Board's finding on this point and included a boilerplate statement that "[s]ome other matters are argued on petition which are not determinative and it is not necessary to discuss them." J.A. 256.

The NCC renews this objection on appeal, though it now mentions only that the 11.5 figure was supposedly for the entire range of the item 26280 series. *See* Petitioner's Brief at 39–40. Once again on appeal, the government does not acknowledge or answer this contention.

We cannot say with certainty that the agency's continued failure to address this point on remand would cause us to return this case to the agency a second time, in the event that the agency's disposition were appealed. It is possible that the mixed-truckload argument will become unimportant in the agency's disposition of this case on remand. On the other hand, the "function of the [reviewing] court is to assure that the agency has given reasoned consideration to all the material facts and issues." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). The NCC's argument on this point was raised in timely fashion and appears to call into question one prop supporting the agency's decision as it now stands. Thus, if the agency intends to rely in the future on the Review Board's contention that mixed-truckload shipments are notably more dense than 11.5 pounds per cubic foot, it will need to explain why the NCC's objections on this point are unfounded.

___

tal evidence was persuasive when it said that "evidence presented by NCC might appear at first glance to justify the proposed LTL classification." J.A. 188. The NCC is on much shakier ground here. The point of the quoted sentence was mainly to contrast the *LTL* showings with the lack of evidence on *truckload* and

*mixed-truckload* densities. Moreover, while the evidence might have been persuasive at first glance, it is clear that the Review Board ultimately found troubling the NCC's omission from exhibits G and H of the thirteen additional transportation characteristics.

## V

We remand this case to the agency for further proceedings. As most of our objections to the agency's explanations for its decision are now aimed at the Division's opinion on mandatory appeal, however, we see no present reason why the agency need start from the beginning with a new initial decision before a review board. (This is not to say, of course, that the Division could not properly find on appeal that further hearings of this sort were appropriate.) The conduct of the proceedings in this regard is within the agency's sound discretion.

*It is so ordered.*